Filed 6/1/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY WATER DISTRICT, | D070562 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 04CC00715) |
| MAG AEROSPACE INDUSTRIES, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Orange County, Kim G. Dunning, Judge. Affirmed.

Connor, Fletcher & Hedenkamp, Edmond M. Connor and Douglas A. Hedenkamp; Miller & Axline, Duane C. Miller, Michael D. Axline and Justin Massey for Plaintiff and Appellant.

Higgs Fletcher & Mack, John Morris and Alexis S. Gutierrez for Defendant and Respondent.

The Orange County Water District (the District) appeals a judgment in favor of MAG Aerospace Industries, Inc. (MAG) following a bench trial on the District's claims under the Carpenter-Presley-Tanner Hazardous Substances Account Act (HSAA; Health

& Saf. Code, § 25300 et seq.) and the Orange County Water District Act (OCWD Act; West's Ann. Wat. Code App. (2016 ed.) ch. 40) and for declaratory relief (Code Civ. Proc., § 1060) and summary adjudication of the District's common law claims for negligence, nuisance, and trespass. The District contends: (1) the trial court erred during the bench trial by granting MAG's motion for judgment under Code of Civil Procedure section 631.8 on the District's HSAA claim; (2) the trial court erred under Code of Civil Procedure section 1048, subdivision (b) by scheduling a bench trial on the District's equitable claims before a jury trial on the District's legal claims, thereby depriving the District of its right to trial by jury; (3) the trial court erred by granting declaratory relief in favor of MAG in the absence of a request by MAG; and (4) the trial court erred by applying Evidence Code section 412 to discount the conclusions of the District's expert witness. The District does not challenge the judgment on its claim under the OCWD Act.

For reasons we will explain, we affirm. Although the trial court may have used an incorrect causation standard under the HSAA, any such error was harmless in light of the trial court's factual findings, which the District does not challenge and which foreclose the District's claim under the correct causation standard. The trial court also did not abuse its discretion under Code of Civil Procedure section 1048 by adhering to California's longstanding "equity first" rule and holding a bench trial on the District's equitable claims before scheduling a jury trial on the District's legal claims. The District's remaining contentions are similarly unavailing because the District has not established any prejudicial error in the court's declaratory judgment or its application of Evidence Code section 412.

2

FACTUAL AND PROCEDURAL BACKGROUND

The District is a public entity established by the California Legislature and empowered to manage, replenish, regulate, and protect groundwater supplies within its boundaries. (OCWD Act, §§ 1, 2.) The District has the power to "[t]ransport, reclaim, purify, treat, inject, extract, or otherwise manage and control water for the beneficial use of persons or property within the district and protect the quality of groundwater supplies within the district." (*Id.*, § 2, subd. (6)(j).) In furtherance of these goals, the District may "commence, maintain, intervene in, defend, and compromise . . . any and all actions and proceedings . . . to prevent . . . diminution of the quantity or pollution or contamination of the water supply of the district . . . ." (*Id.*, § 2, subd. (9).)

In 2004, the District filed this lawsuit against MAG and several other defendants to address current and threatened groundwater contamination in northern Orange County. In its operative first amended complaint (FAC), the District alleged that MAG owned and operated an industrial site at 1300 East Valencia Drive in Fullerton, California (the Valencia site). The District alleged that MAG and other owners and operators at the Valencia site released hazardous wastes there, including the volatile organic compound PCE (tetrachloroethylene or perchloroethylene). The release of hazardous waste had caused or threatened to cause contamination to groundwater within the District's geographic area. The District alleged injury in the form of investigation and remediation costs to address this contamination and threatened contamination, as well as the ongoing threat to public health, natural resources, and the environment posed by the hazardous waste releases. To recover its costs and address this threat, the District alleged causes of

3

action against all defendants, including MAG, under the OCWD Act and the HSAA and under common law theories of negligence, nuisance, and trespass. The District also alleged a cause of action for declaratory relief, which claimed "[a]n actual controversy exists concerning who is responsible for abating actual or threatened pollution or contamination of groundwater within the District by [volatile organic compounds]" and sought "adjudication of the respective rights and obligations of the parties." The District sought compensatory and punitive damages, attorney fees, costs, an order finding defendants liable for the full cost of remediation, an order declaring the contamination a nuisance and compelling defendants to abate it, and any other proper relief.

During a status conference, the court announced its intention to bifurcate trial on the District's claims, with an initial bench trial on the District's equitable claims (under the OCWD Act and the HSAA and for declaratory relief) and a subsequent jury trial on the District's legal claims (for negligence, nuisance, and trespass). The District urged the court to try its legal claims first in front of a jury and expressed concern that holding a bench trial first would impair its right to a jury trial on its legal claims. The court acknowledged the District's right to a jury trial but confirmed its inclination to hold a bench trial first.

The bench trial began in February 2012. The District presented testimony from various percipient and expert witnesses. After the District's case-in-chief, MAG moved for judgment under Code of Civil Procedure section 631.8. The District opposed. Following a hearing, the court tentatively granted MAG's motion but allowed the District to reopen its case. (Code Civ. Proc., § 631.8, subd. (a).) The District presented

4

additional testimony, after which MAG renewed its motion. The court granted the motion, finding in MAG's favor on the District's claims under the OCWD Act and the HSAA and for declaratory relief.[1]

In its statement of decision, the court recited the procedural history of the District's lawsuit, made factual findings based on the evidence presented a trial, and issued conclusions of law. The court found that the Valencia site had been used for industrial purposes since 1965. Some of these uses involved PCE, and testing in 1988 confirmed PCE contamination in the soil at the site.

MAG leased the Valencia site from 1989 through 2002. For six of these years, MAG used PCE there as well in an above-ground, concrete facility. MAG engaged a service to dispose of spent chemicals. Prior to the end of MAG's lease, the owner of the Valencia site engaged a consultant to conduct another round of environmental testing. This testing again found PCE in the soil, but, as the trial court explained, "the sampling confirmed that concentrations of PCE decreased as the samplings went deeper, to the point that the contaminant could no longer be detected." The lowest detected depth of PCE contamination was 80 feet below grade, and samplings at 90, 100, and 110 feet below grade revealed the absence of PCE.

---

[1] The court held a single bench trial on the District's equitable claims against MAG and its codefendants. Following the court's order granting MAG's motion for judgment, the bench trial as to MAG's codefendants proceeded to conclusion. The judgment involving MAG's codefendants are considered in a separate opinion filed this date. (*Orange County Water District v. Alcoa Global Fasteners, Inc.* (June 1, 2017, D070771) __ Cal.App.5th __.)

The testing showed that the groundwater under the Valencia site began approximately 120 feet below grade. It also showed, in the words of the trial court, that there was "no direct pathway of PCE from the soil surface to the groundwater" and that "a continuous stiff layer of nonpermeable silts and clays at about 70 to 80 feet below ground surface" further impacted any such potential pathway.

The testing consultant installed five groundwater monitoring wells at the Valencia site. One well, located near the site of a degreaser where MAG used PCE, detected PCE in the groundwater below the Valencia site. Other wells detected another volatile organic compound in the groundwater, trichloroethylene (TCE). Neither MAG nor its predecessor used TCE at the Valencia site.

Based on these results, the Regional Water Quality Control Board for the Santa Ana Region (RWQCB) requested further testing after MAG left the site. This testing confirmed that the concentrations of PCE in the soil at the Valencia site were largely stable. The testing consultant concluded there was no need for remediation at the Valencia site. It also concluded that offsite facilities located at higher elevations than the Valencia site released various volatile organic compounds, including PCE, and that these "releases reached groundwater and contributed to the reported contamination and pollution beneath" the Valencia site.

The RWQCB issued a closure report concluding that the Valencia site " 'does not appear to pose a current, significant threat to the beneficial uses of groundwater. Therefore . . . no further action with respect to soil and groundwater investigation or

6

remediation at this time is necessary.' "  The District received a copy of the closure report as well as the testing consultant's reports on the Valencia site.

Drawing on these facts, which we take from the trial court's statement of decision and which the District does not challenge on appeal, the court made the following conclusions:  (1) "Noticeably absent from the [District's] case-in-chief (and rebuttal case) was any evidence of a causal connection between the shallow sub-surface PCE findings—apparently in place well before MAG operated at the Valencia [site]—and the (already contaminated) groundwater."  (2) "At the close of its case, the District had not offered any credible evidence that observed PCE contamination from the shallow soil at the Valencia [site] (from whatever source) did or would at any time in the future migrate to the groundwater."  (3) "[T]he evidence clearly establishes that the PCE in the groundwater below the Valencia [site] migrated there from multiple offsite sources." (4) "[T]he District failed to present evidence establishing its *prima facie* case that the Valencia [site] or MAG's operations at the Valencia [site] caused or threatened to cause groundwater contamination or pollution which required the District to incur remediation or clean-up costs."

The trial court determined that the District had not carried its burden of proof on its claims under the OCWD Act or the HSAA.  As to the HSAA, the trial court wrote, "A necessary element of establishing liability . . . is proof that a release or threatened release 'caused' plaintiff to incur response costs.  Consequently, the plaintiff must establish a causal link between the release for which a defendant is responsible, and the response costs incurred by plaintiff."  The trial court explained, "there was no documented release

7

of any [volatile organic compound], including PCE, by MAG. . . . Even if there were such a documented release, there is no evidence of a vertical pathway showing that PCE migrated from the surface to the groundwater." It concluded, "Because there is no viable, admissible evidence that MAG caused a release of PCE into the environment, MAG cannot be liable under the HSAA."

The court criticized the District's claim for declaratory relief as imprecise. However, to the extent the District was seeking a declaration that MAG was responsible for future remediation costs, the court declined to do so "because the District offered no evidence regarding its anticipated future costs relating to MAG's activities." The court also repeated its conclusion that "the District's evidence failed to demonstrate that MAG could have or did cause groundwater contamination or pollution, or that its conduct threatened to cause contamination or pollution at the Valencia [site] in the future. . . . As a result, the District's Declaratory Relief Count and the requested relief are premised on inconclusive information." The court's heading for this section stated, "The District failed to establish a justiciable controversy between itself and MAG." (Some capitalization omitted.)

Six months later, MAG filed a motion for summary adjudication of the District's remaining claims for negligence, nuisance, and trespass. MAG argued that those claims were predicated on the same theories and evidence offered by the District during the bench trial and were therefore deficient for the same reasons. The District opposed, contending that the standards on summary judgment and on MAG's earlier motion for judgment were different. On reply, MAG argued that the court's factual findings

8

following the bench trial on the District's equitable claims were binding on the District's remaining legal claims, thereby requiring summary adjudication of the latter claims. The court granted MAG's motion, finding that the dispositive factual issues had already been resolved against the District and those findings precluded recovery by the District on its remaining claims.

The court entered judgment in favor of MAG and against the District on all of the District's claims. The judgment included a declaration "that [MAG] has no liability to [the District] for damages, response costs, or other costs claimed by [the District], or any future costs." The District appeals.

DISCUSSION

I

A

The District first contends the trial court erred by granting MAG's motion for judgment on its HSAA claim. "After a party has completed his presentation of evidence in a trial by the court, the other party . . . may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make a statement of decision . . . , or may decline to render any judgment until the close of all the evidence." (Code Civ. Proc., § 631.8, subd. (a).) " 'The purpose of Code of Civil Procedure section 631.8 is "to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact." [Citation.] Under the statute, a court acting as trier of fact may enter judgment in favor of

9

the defendant if the court concludes that the plaintiff failed to sustain its burden of proof. [Citation.]  In making the ruling, the trial court assesses witness credibility and resolves conflicts in the evidence.' "  (*Kinney v. Overton* (2007) 153 Cal.App.4th 482, 487 (*Kinney*).)  " 'Because the trial court evaluates the evidence as a trier of fact, it may refuse to believe some witnesses while crediting the testimony of others.' "  (*Medrazo v. Honda of North Hollywood* (2012) 205 Cal.App.4th 1, 10 (*Medrazo*); see *Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1255 ["In doing so, the court may refuse to believe witnesses and draw conclusions at odds with expert opinion."].)

The trial court's ability to weigh the evidence and consider witness credibility distinguishes a motion for judgment from a motion for nonsuit during a jury trial, which also challenges a plaintiff's evidence at the close of the plaintiff's case-in-chief.  When considering a motion for nonsuit, a trial court must deny the motion "if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor."  (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838.)  In other words, to avoid a nonsuit, a plaintiff must introduce evidence sufficient to establish a prima facie case. (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 694; *Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, 1266.)  If a plaintiff makes out a prima facie case, a motion for nonsuit must be denied.  When considering a motion for judgment during a bench trial, a trial court is not so limited.  Even if a plaintiff introduces evidence sufficient to establish a prima facie case, the trial court may still conclude the plaintiff has not carried his or her burden of proof and grant judgment in favor of the moving defendant.  For example, on a motion for judgment, the trial court

10

may disbelieve the plaintiff's evidence, draw adverse (rather than favorable) inferences therefrom, and credit contrary evidence introduced through cross-examination or otherwise.

" 'The standard of review after a trial court issues judgment pursuant to Code of Civil Procedure section 631.8 is the same as if the court had rendered judgment after a completed trial—that is, in reviewing the questions of fact decided by the trial court, the substantial evidence rule applies." (*Medrazo, supra*, 205 Cal.App.4th at p. 10.)  " 'But, we are not bound by a trial court's interpretation of the law . . . .' " (*Kinney, supra*, 153 Cal.App.4th at p. 487.)  " 'We review legal issues . . . under a de novo or independent standard.' " (*Fink v. Shemtov* (2012) 210 Cal.App.4th 599, 608.)

The District does not challenge the court's factual findings.  We therefore accept them as established.  If the District were challenging these findings, we would find any such challenge waived because the District did not set forth all material evidence supporting the court's order.  (See *Holguin v. DISH Network LLC* (2014) 229 Cal.App.4th 1310, 1326.)

The District instead asserts that the court misinterpreted the elements of its claim under the HSAA.  The relevant provision of the HSAA provides a private right of action as follows:  "A person who has incurred response or corrective action costs in accordance with this chapter . . . or the federal act may seek contribution or indemnity from any person who is liable pursuant to this chapter."  (Health & Saf. Code, § 25363, subd. (d).)  The "federal act" referenced in the HSAA is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA; 42 U.S.C.

11

§ 9601 et seq.). (Health & Saf. Code, § 25315.) "HSAA is the California counterpart to CERCLA. [Citation.] Although the HSAA incorporates many CERCLA concepts, it is not identical." (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 865, fn. 4.)

Among the concepts incorporated from CERCLA are its liability provisions: " 'Responsible party' or 'liable person,' for purposes of this chapter, means those persons described in Section 107(a) of the federal act (42 U.S.C. Sec. 9607(a))." (Health & Saf. Code, § 25323.5, subd. (a)(1).) CERCLA establishes four categories of potentially responsible persons. (42 U.S.C. § 9607(a)(1)-(4).) The relevant category here provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable" for the cost of removal or remedial action and other responses. (42 U.S.C. § 9607(a).) Therefore, under CERCLA and the HSAA, " '[t]o prevail in a private cost recovery action, a plaintiff must establish that (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of the term, Section 101(9), 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a) [42 U.S.C. § 9607(a)].' "

12

(*Carson Harbor Village, Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, 870-871 (*Carson Harbor*) [en banc]; see *Gregory Village Partners, L.P. v. Chevron U.S.A., Inc.* (N.D.Cal. 2011) 805 F.Supp.2d 888, 897 ["A claim under the HSAA has the same elements as a claim under CERCLA."].)

Causation under CERCLA, and therefore under the HSAA, is addressed in the third element. As we will explain, this element departs from traditional tort theories of causation. For example, this element "does not require a plaintiff to show that a particular defendant caused either the release or the incurrence of response costs in order to prove liability." (*Kalamazoo River Study Group v. Menasha Corp.* (6th Cir. 2000) 228 F.3d 648, 655 (*Kalamazoo River*).) Instead, potentially liable defendants (or, in CERCLA terminology, "potentially responsible parties") are identified as classes of persons in the fourth element. These classes of persons include parties who might otherwise not be considered liable under traditional tort theories, e.g., current owners and operators of a contaminated facility. (See 42 U.S.C. § 9607(a)(1).)

Once these elements are proven, an HSAA defendant is strictly liable for recoverable costs (Health & Saf. Code, § 25363, subd. (c)) unless the defendant establishes an applicable defense (*id.*, § 25323.5, subd. (b)) or the circumstances justify apportionment (*id.*, § 25363, subds. (a)-(b)). A similar scheme exists under CERCLA: "Potentially responsible parties under CERCLA are strictly liable for cleanup costs [citation], subject only to the statute's narrow defenses for damages caused solely by acts of God, war, or third parties." (*Westfarm Associates L.P. v. Washington Suburban*

13

*Sanitary Com.* (4th Cir. 1995) 66 F.3d 669, 677; see 42 U.S.C. § 9607(b).) The HSAA largely incorporates CERCLA's defenses. (Health & Saf. Code, § 25323.5, subd. (b).)

B

The District contends the trial court misinterpreted the third element (causation) and fourth element (potentially responsible parties) of its HSAA claim. We will address each in turn.

Regarding the third element, the District argues that the court erroneously required the District to prove that *MAG* released or threatened to release hazardous waste that caused the District to incur response costs.[2] The District is correct that it was not required to prove a causal connection between a release *by MAG* and its response costs.

"[V]irtually every court that has considered this question has held that a CERCLA plaintiff need not establish a direct causal connection between the defendant's hazardous substances and the release or the plaintiff's incurrence of response costs." (*United States v. Alcan Aluminum Corp.* (3d Cir. 1992) 964 F.2d 252, 265 (*Alcan Aluminum*); see *State of N. Y. v. Shore Realty Corp.* (2d Cir. 1985) 759 F.2d 1032, 1044 (*Shore Realty*).) The causation requirement under CERCLA and HSAA is independent of a given defendant. (*Kalamazoo River, supra*, 228 F.3d at p. 655.) It focuses on whether there was a release or threatened release at the facility at issue, not whether the defendant caused the release or threatened release. For purposes of the third element, a plaintiff need only prove that a

_____

[2]     The response costs claimed by the District are its efforts to investigate and remediate groundwater contamination related to the Valencia site.

14

release or threatened release occurred at the facility that caused the plaintiff to incur necessary response costs. (*Carson Harbor, supra*, 270 F.3d at pp. 870-871.)

Whether a given defendant is liable is governed by the fourth element. This element makes clear that liability is based on the defendant's relationship to the facility—not the defendant's relationship to the release or threatened release that caused the incurrence of response costs. (See *Alcan Aluminum, supra*, 964 F.2d at p. 265 ["[T]he version [of CERCLA] ultimately passed by Congress . . . imposed liability upon a *class* of responsible persons without regard to whether the person specifically caused or contributed to the release and the resultant response costs."]; *Asarco LLC v. NL Industries, Inc.* (E.D.Mo. 2015) 106 F.Supp.3d 1015, 1031 (*Asarco*) ["Once the connection between the defendant and a hazardous waste site has been established (because the defendant fits into one of the four categories of responsible parties), 'it is enough that response costs resulted from "a" release or threatened release—not necessarily the defendant's release or threatened release.' "].)[3]

---

[3]   The lack of a causal connection between a defendant's actions and the release or threatened release that caused the incurrence of response costs is instead an affirmative defense that the defendant must prove. CERCLA provides, "There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by [¶] . . . [¶] (3) an act or omission of a third party" under specified circumstances. (42 U.S.C. § 9607(b).) This defense has been incorporated into the HSAA. (Health & Saf. Code, § 25323.5, subd. (b); see *id.*, § 25363, subd. (a).) Requiring a plaintiff to prove that a release or threatened release *by the defendant* caused the incurrence of response costs would render this affirmative defense superfluous. (*Kalamazoo River, supra*, 228 F.3d at p. 655; *Alcan Aluminum, supra*, 964 F.2d at p. 265; *Shore Realty, supra*, 759 F.2d at p. 1044.)

15

The trial court's statement of decision as to the third element is ambiguous. In its legal discussion, the court explained its understanding of the HSAA claim, in part, as follows: "A necessary element of establishing liability under CERCLA is proof that a release or threatened release 'caused' plaintiff to incur response costs. Consequently, the plaintiff must establish a causal link between the release for which a defendant is responsible, and the response costs incurred by plaintiff." It is unclear whether the latter sentence would require a plaintiff to show that defendant is "responsible" in a causal sense for a release or threatened release or "responsible" in the sense of being a potentially responsible party under the fourth element of a CERCLA or HSAA claim.

In other portions of the statement of decision, the court appears to have focused on whether *MAG* caused a release that resulted in response costs, which is an incorrect standard. For example, the heading of its discussion of the District's HSAA claim states, "MAG is entitled to judgment on the second cause of action because there is no evidence that MAG released a hazardous substance which contaminated groundwater." (Some capitalization omitted.) Similarly, in its conclusion, the court wrote, "Because there is no viable, admissible evidence that MAG caused a release of PCE into the environment, MAG cannot be liable under the HSAA." These statements do not reflect the proper standard under the HSAA because they require the District to prove that *MAG* caused a release, rather than *someone* caused a release from the Valencia site at issue in the lawsuit. It therefore appears the trial court potentially applied the wrong legal standard on causation. The correct standard requires only that a release or threatened release

16

occurred at the Valencia site, from whatever source, and that release or threatened release caused the District to incur necessary response costs.

The District argues that the court applied the wrong legal standard and, had it applied the correct standard, it would have received a more favorable result. According to the District, the court would not have granted MAG's motion for judgment if it had used the correct legal standard. We disagree. The court's factual findings show that it would have granted MAG's motion even if it had used the correct legal standard.

As we have noted, the response costs claimed by the District stem from its efforts to investigate and remediate groundwater contamination. Because the District's efforts are focused on groundwater, if a PCE release at the Valencia site did not cause groundwater contamination, that release could not have caused the District's response costs. Instead, the District's response costs would be caused by other releases, at other sites, that caused contamination in groundwater. The District does not appear to contend, for example, that the release of PCE into the shallow soil at the Valencia site, in and of itself, caused it to incur response costs.[4]

In its statement of decision, the trial court repeatedly found that a release from the Valencia site—from whatever source, MAG or otherwise—did not cause groundwater contamination or response costs incurred by the District: (1) "Noticeably absent from the [District's] case-in-chief (and rebuttal case) was any evidence of a causal connection

_____

[4] The District does contend that the causal link between PCE contamination in the shallow soil at the Valencia site and PCE contamination in the groundwater at the Valencia site should be presumed. We will address several variations of that argument, *post*.

17

between the shallow sub-surface PCE findings—apparently in place well before MAG operated at the Valencia [site]—and the (already contaminated) groundwater." (2) "At the close of its case, the District had not offered any credible evidence that observed PCE contamination from the shallow soil at the Valencia [site] (from whatever source) did or would at any time in the future migrate to the groundwater." (3) "[T]he evidence clearly establishes that the PCE in the groundwater below the Valencia [site] migrated there from multiple offsite sources." (4) "[T]he District failed to present evidence establishing its *prima facie* case that the Valencia [site] or MAG's operations at the Valencia [site] caused or threatened to cause groundwater contamination or pollution which required the District to incur remediation or clean-up costs."

Each of these factual findings bears directly on the correct legal standard under the HSAA, i.e., whether a release or threatened release from the Valencia site, whatever the source, caused the District to incur response costs, and resolved the issue against the District. (See *Carson Harbor, supra*, 270 F.3d at pp. 870-871; *Santa Clara Valley Water Dist. v. Olin Corp.* (N.D.Cal. 2009) 655 F.Supp.2d 1048, 1057 ["Cases within the Ninth Circuit support the conclusion that a CERCLA *prima facie* case requires a plaintiff to show that a release caused the incurrence of some response costs . . . ."].) Given the court's factual findings, the court's potential misinterpretation of the causation element of the HSAA was harmless.

In resisting this conclusion, the District claims that the required proof of causation under CERCLA (and therefore the HSAA) departs from traditional notions of substantial-factor causation. The District relies primarily on *United States v. Monsanto Co.* (4th Cir.

18

1988) 858 F.2d 160 (*Monsanto*). *Monsanto* is inapposite. The portion the District relies upon does not consider causation under the third element of CERCLA liability. (*Id.* at p. 169.) Instead, *Monsanto* considered the scope of the fourth element, specifically the potential liability of so-called "generator" defendants under section 9607(a)(3) of title 42 of the United States Code. (*Monsanto, supra*, 858 F.2d at p. 169.) A generator defendant is liable if a plaintiff proves it is a "person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." (42 U.S.C. § 9607(a)(3).)

*Monsanto* interpreted this provision to impose liability on defendants who generated hazardous substances at one site and arranged for disposal of the hazardous substances at another site, so long as the defendant's hazardous substances were chemically similar to those released or threatened to be released at the disposal site. (*Monsanto, supra*, 858 F.2d at p. 169 & fn. 15 ["[CERCLA plaintiffs] must . . . present evidence that a generator defendant's waste was shipped to a site and that hazardous substances similar to those contained in the defendant's waste remained present at the time of release."].) Regardless of *Monsanto*'s interpretation of the fourth element for generator defendants, the third element must still be satisfied.

And, in any event, the provision of the fourth element applicable to MAG, section 9607(a)(2) of title 42 of the United States Code, is quite different. It imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated

19

any facility at which such hazardous substances were disposed of." (42 U.S.C. § 9607(a)(2).) As we will discuss in more detail *post*, a defendant's liability under this provision is based on the defendant's activities at the facility where the release occurred. (*Ibid.*) *Monsanto*'s analysis of a generator defendant's liability when its hazardous wastes are transported to a common facility is therefore inapplicable. *United States v. Wade* (E.D.Pa. 1983) 577 F.Supp. 1326, also cited by the District, involved generator defendants, like *Monsanto*, and it is unpersuasive for the same reasons.

Similarly, the District's reliance on cases rejecting the requirement of "fingerprinting" or "tracing" hazardous substances is unavailing. *Asarco*, which the District cites approvingly, rejected the requirement that a plaintiff provide proof of fingerprinting or tracing a defendant's hazardous waste to impose liability. (*Asarco, supra*, 106 F.Supp.3d at p. 1031.) But *Asarco*'s conclusion applied only to tracing a specific defendant's waste, i.e., a release of waste attributable to a specific defendant. (*Ibid.*) As we have already discussed, a release need not be attributed to a specific defendant for that defendant to be held liable. What a plaintiff must do—and what the trial court found the District had failed to do—is prove a causal connection between a release or threatened release, from whatever source, and a plaintiff's response costs. (*Ibid.* ["Response costs must be caused by an actual or threatened release."].) The other authorities cited by the District likewise confirm this causation requirement. (*Thomas v. FAG Bearings Corp.* (W.D.Mo. 1994) 846 F.Supp. 1382, 1394, 1400 (*Thomas*) [granting summary judgment because plaintiff could not show the release at issue caused groundwater contamination]; *Artesian Water Co. v. Government of New Castle County*

20

(D.Del. 1987) 659 F.Supp. 1269, 1282 (*Artesian Water*) ["CERCLA's strict liability scheme does not diminish the necessity of demonstrating a causal connection between a release or threatened release and the incurrence of costs by a . . . plaintiff.  [Citations.] [Plaintiff] must therefore show that it incurred costs as a result of the release or threatened release of hazardous substances from the Site."].)[5]  Indeed, *Artesian Water* expressly confirmed that traditional tort principles of causation, including substantial-factor causation where multiple sources may have contributed to contamination, govern CERCLA's causation requirement.  (*Artesian Water, supra*, 659 F.Supp. at p. 1283.) CERCLA's departure from traditional tort principles can be found in the omission of the defendant from that requirement, which, as we have discussed, focuses on whether a *release* caused plaintiff's response costs, rather than whether a *defendant* caused plaintiff's response costs.

In sum, although the trial court's statement of decision included ambiguous language suggesting the court applied an incorrect legal standard by requiring the District to show that a release or threatened release *by MAG* caused it to incur response costs, we conclude any error was harmless.  The court found that any release from the Valencia site, whether by MAG or not, did not cause groundwater contamination or the District's

---

5  Both *Thomas* and *Artesian Water* discuss fingerprinting or tracing primarily in connection with the requirement that a plaintiff prove a release has occurred.  (*Thomas, supra*, 846 F.Supp. at pp. 1389-1390; *Artesian Water, supra*, 659 F.Supp. at p. 1282.) These discussions have no bearing on the disputed issue here because the trial court impliedly found that a release of PCE had occurred at the Valencia site.  The issue here is therefore not whether a release occurred at the Valencia site but whether the District proved that the release caused it to incur response costs.  After weighing the evidence presented at trial, the court found it had not.

21

response costs. Because such a causal connection is required under the HSAA, the court's finding foreclosed the District's claim and the trial court properly granted MAG's motion for judgment.

We note the trial court's finding, in part, that the District failed to establish a "prima facie case" of causation under the HSAA has created some confusion in this appeal. In its briefing, the District summarizes evidence supporting the inference that the PCE release at the Valencia site caused contamination of groundwater and therefore the District's response costs, i.e., evidence that would support a prima facie case of causation. Based on our review of the record, the evidence at trial bearing on the element of causation was not undisputed. Our standard of review, however, precludes us from reweighing this evidence on appeal. The trial court found that the release did *not* cause groundwater contamination, and the District does not attempt to show that this finding was not supported by substantial evidence or that the court was required to make the opposite finding as a matter of law.

Given the procedural posture of this appeal, the authorities cited by the District regarding the requirements for it to establish a prima facie case, or for it to survive summary judgment, are inapposite. (See, e.g., *Castaic Lake Water Agency v. Whittaker Corp.* (C.D.Cal. 2003) 272 F.Supp.2d 1053, 1066 [concluding "the plaintiff meets its burden on summary judgment if it . . . provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site," among other elements].) Even assuming the District had established a prima facie case at trial or offered evidence sufficient to survive summary judgment, on a

22

motion for judgment the trial court was entitled to assess the credibility of the District's evidence, weigh it against contrary evidence and inferences, and determine whether the District had met its burden of proof at trial. (See *Medrazo, supra*, 205 Cal.App.4th at p. 10; *Kinney, supra*, 153 Cal.App.4th at p. 487; *Jordan v. City of Santa Barbara, supra*, 46 Cal.App.4th at p. 1255.) The court here found that the District had not met its burden. Whether the District established a prima facie case of causation is irrelevant.

Regarding the fourth element, the District argues that the court erroneously required the District to prove that MAG *released* hazardous waste, rather than simply *disposed* of it. As we have discussed, this element requires the District to show that MAG is a "person who at the time of *disposal* of any hazardous substance owned or operated at which such hazardous substances were *disposed* of." (42 U.S.C. § 9607(a)(2), italics added.)

The terms "disposal" and "release" are defined separately. "The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." (42 U.S.C. § 6903(3); see *id.*, § 9601(29).) "The term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)," with certain exclusions not relevant here. (*Id.*, § 9601(22).)

23

Given their overlapping definitions (including the fact that a "release" is defined to include "disposing into the environment"), the distinction between the two terms is not readily apparent. Courts have, however, emphasized that the definition of "disposal" is "broad" since it includes any placing of hazardous waste on land or in water such that the waste " '*may* enter the environment or . . . the air or . . . [any] water[s].' " (*United States v. Fleet Factors Corp.* (S.D.Ga. 1993) 821 F.Supp. 707, 723; see *Voggenthaler v. Maryland Square LLC* (9th Cir. 2013) 724 F.3d 1050, 1064.)

In its statement of decision, the trial court recited the correct standard for determining whether MAG was a liable party under title 42 United States Code section 9607(a)(2) and Health and Safety Code section 25323.5, subdivision (a)(1): " 'any person who at the time of the disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.' " Its discussion, however, focused on the possibility that MAG "released" hazardous waste rather than "disposed" of it. It is therefore likely that the trial court did not consider this element or did not apply the correct legal standard.

The District contends the trial court would have found that MAG disposed of PCE, thereby satisfying the fourth element of its HSAA claim, had the court applied the correct legal standard. Even assuming the District is correct, it is of no moment. As we have explained, the trial court made express factual findings that foreclosed the District's HSAA claim based on the third element, causation. Even if the court had found that the District had satisfied the fourth element of its claim, the third element was still lacking.

24

The court would still have properly granted MAG's motion for judgment. The District has not shown prejudicial error.

II

The District next contends the trial court erred by (1) bifurcating trial and scheduling a bench trial on the District's equitable claims before a jury trial on the District's legal claims and (2) treating its factual findings following the bench trial as binding on the District's legal claims. The District argues the court deprived it of its right to trial by jury on its legal claims and thereby violated Code of Civil Procedure section 1048, subdivision (b).

In advance of a pretrial status conference, the District submitted a statement proposing that its legal claims be tried first before a jury and its equitable claims be determined by the court afterwards. MAG and its codefendants proposed the opposite schedule. They explained that any factual findings made as a result of the bench trial would be binding in the jury trial, thereby shortening the jury trial or eliminating it entirely.

At the status conference, the court said it was inclined to try the equitable issues first. The District expressed its concern that it would not be able to present its legal claims to a jury if the court resolved its equitable claims adversely: "And the problem is that if you rule on any issue, the defendants will argue that that precludes us from going to a jury on our tort claims, that that's been resolved for all time." The court responded, "Well, that can be handled before we start the trial with exactly some understanding, either an understanding among counsel or an order from the court, as to exactly what the

25

court's rulings mean, doesn't it?"  The District agreed, "That's one potential solution," but it was concerned about duplicative presentations of evidence.  The court discussed what would happen if the District did not prevail on its equitable claims:  "Let's take the flip side.  You do the court trial and plaintiffs don't prevail on the statutory causes of action.  As long as we're clear going in kind of what the parameters are, plaintiff would still have a choice whether plaintiff wanted to—having had a verdict or a judgment—or a decision in a court trial on statutory causes of action, whether it makes [sense] to go forward with a jury."  The court later remarked, "But I think we all agree that while you have an absolute right—an absolute right—and I would never try and talk anybody out of jury trial on the causes of action where you'd have the right to a jury trial—sometimes that's not the economically or physically, that's not the best way to go."  After a lengthy discussion of joint and several liability, the court stated, "But look, unless somebody comes up with a real show stopper, I'm inclined to try the court issues first.  I think on balance it is just a better way to go."[6]

As we have discussed, the court held a bench trial on the District's claims under the OCWD Act and the HSAA and for declaratory relief.  The court found, among other

---

[6]     MAG contends that the District forfeited its argument that the trial court erred because it failed to object to the sequencing of trial.  We disagree.  "If the party, at the time when the order, ruling, action or decision is sought or made, or within a reasonable time thereafter, makes known his position thereon, by objection *or otherwise*, all other orders, rulings, actions or decisions are deemed to have been excepted to."  (Code Civ. Proc., § 647, italics added.)  Here, the District made known its position both in its status conference statement and at the status conference itself that the court should hold a jury trial first and the bench trial thereafter.  It did not have to object again after the court announced its intent to hold the bench trial first; it had already made its position known.  The District did not forfeit its claim of error.

26

things, that MAG did not cause a release of PCE and that no release from the Valencia site (whether or not by MAG) caused the contamination of groundwater or the District's response costs. Following trial, MAG filed a motion for summary adjudication of the District's legal claims for negligence, nuisance, and trespass. The court granted MAG's motion, finding that the dispositive factual issues had already been resolved against the District in connection with the bench trial and those findings precluded recovery by the District on its legal claims.

In a related appeal arising from this litigation, we consider the District's claim. (*Orange County Water District v. Alcoa Global Fasteners, Inc., supra*, ___ Cal.App.5th at pp. ___ [pp. 137-149].) Our discussion in that appeal applies equally here, and we need not repeat it. In summary, we conclude the trial court did not violate the District's jury trial right or abuse its discretion by holding a bench trial on the District's equitable claims first and applying its findings to the District's legal claims. (*Id.* at pp. __ [pp. 142-144, 149]; see *Raedeke v. Gibraltar Savings & Loan Assn.* (1974) 10 Cal.3d 665, 671 ["It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury . . . , and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury."].)

III

The District challenges the trial court's declaration that MAG does not have any liability to the District for "future costs" related to the District's remediation efforts. The District first argues the declaration must be reversed if the court's judgment on the

27

District's HSAA claim is reversed. Because we affirm that judgment (see part I, *ante*), the District's argument necessarily fails. The District next argues that the trial court could not have entered declaratory judgment in MAG's favor because MAG did not request such a declaration. But the law is exactly the opposite: When a plaintiff requests declaratory relief, but does not show he or she is entitled to the requested declaration, "the more appropriate practice [is] to render an express, unfavorable declaration." (*Loyola Marymount University v. Harford Accident & Indemnity Co.* (1990) 219 Cal.App.3d 1217, 1221, fn. 3; see *Anderson v. Stansbury* (1952) 38 Cal.2d 707, 717 ["However, plaintiffs' complaint also included a count for declaratory relief, and the disposition of such count would ordinarily require an express declaration of the rights of the parties."].) The trial court did not err by making such a declaration here.

For the first time on reply, the District argues that the trial court's heading in its statement of decision that the District's declaratory relief action did not present a "justiciable controversy" renders the declaration improper. (See *Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739, 752 ["Where there is no justiciable controversy the proper remedy is not to render judgment for one side or the other, but to dismiss."].) The District has not provided any reason why this argument was not included in its opening brief; it is therefore waived. (*Julian v. Hartford Underwriters Insurance Co.* (2005) 35 Cal.4th 747, 761, fn. 4; *Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1477-1478; *Tilton v. Reclamation Dist. No. 800* (2006) 142 Cal.App.4th 848, 864, fn. 12.) We need not further consider it.

IV

The District contends the trial court improperly invoked Evidence Code section 412 in its statement of decision to view the District's expert testimony skeptically based on the District's acquiescence in the capping of several monitoring wells at the Valencia site that may have provided additional data regarding contamination. The statute provides, "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." (Evid. Code, § 412.)

Even assuming the court erred by applying Evidence Code section 412, the District has not shown there is a reasonable probability, i.e., a reasonable chance, the trial court would have made findings favorable to the District on causation. (See *College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) The District offers only a conclusory statement that the error at issue caused prejudice. Based on our review, the expert testimony impacted by the court's application of the statute related only to threatened contamination of groundwater from PCE releases at the Valencia site. Other highly credible evidence, however, supported the trial court's conclusion that the contamination did not threaten groundwater. As the trial court explained, "With respect to threatened groundwater contamination in the future, the evidence established that the last reported concentrations of PCE in the monitoring wells were stable, and that there was no difference between the readings from the upgradient and downgradient wells. [Citation.] Based on that information, the RWQCB issued its closure letter concluding that no further action is necessary because there was no future threat to groundwater."

29

Given this evidence, and the ample additional reasons for the trial court to distrust the conclusions of the District's expert, we conclude the District has not shown prejudice.

DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.