Filed 10/6/23  Domingo v. Prime Healthcare Paradise Valley CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ARIEL DOMINGO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>PRIME HEALTHCARE PARADISE VALLEY, LLC,<br><br>    Defendant and Respondent. | D079848<br><br><br><br>(Super. Ct. No. 37-2019-23576-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy Taylor, Judge.  Affirmed in part, and reversed in part.

Sullivan & Yaeckel Law Group, APC, William B. Sullivan, Eric K. Yaeckel and Ryan T. Kuhn, for Plaintiff and Appellant.

Seyfarth Shaw LLP, Geoffrey C. Westbrook and Phillip J. Ebsworth, Justin T. Curley and Kiran Aftab Seldon, for Defendant and Respondent.

## INTRODUCTION

Appellant Ariel Domingo filed a representative action under the Private Attorney General Act (PAGA) (Lab. Code,[1] § 2698 et seq.) against his

---

[1]    Further statutory references are to the Labor Code unless noted.  Rule references are to the California Rules of Court.

former employer, Prime Healthcare Paradise Valley, LLC (Prime). He alleged Prime violated the Labor Code and/or applicable Industrial Welfare Commission (IWC) wage order with respect to meal and rest periods, expense reimbursement, compensation (on various grounds), wage statements, and final wages. During discovery, a referee appointed by the trial court recommended denial of Domingo's motion to compel time and wage records for all nonexempt employees on timeliness and other grounds. The trial court adopted the recommendation. The case proceeded to a bench trial, and the court granted Prime's motion for judgment in a detailed statement of decision. The court entered judgment for Prime.

Domingo appeals, contending the trial court erred by denying his motion to compel discovery and entering judgment for Prime on each claimed violation. We conclude Domingo does not demonstrate prejudicial error from the discovery ruling. As for the claimed violations, we determine Domingo establishes reversible error as to Prime's rounding policy based on the record before us, and reverse the judgment to the extent it rests on that policy. We further determine Domingo demonstrates no other lack of substantial evidence or legal error, and affirm the remainder of the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Parties and Underlying Events*

Prime operates Paradise Valley Hospital (the Hospital). During the relevant time period (March 2018 through May 2021), 1,951 nonexempt employees worked for Prime. The employee handbook described Hospital policies on meal and rest periods, timekeeping, and other matters.[2] Prime

---

[2]    Four substantially similar versions of the handbook were in effect during the relevant time period.

used a "JBDev timekeeping system," through which employees clocked in and out for shifts and meal periods, and reviewed an end-of shift attestation (described *post*).

Domingo worked at the Hospital as a cook from 2003 until January 2019, when his employment was terminated.

Cynthia Quinonez was his supervisor, and her employment also was terminated in January 2019. She was the Food Services Manager serving as Executive Chef, and managed the kitchen team to "produc[e] all the meals for the hospital patients, café, and catering." There were about 40 people in the department, and she supervised everyone besides the dieticians. This included Norman Granger, a food services worker.

B.     *Litigation and Discovery*

In February 2019, Domingo sent a notice of wage and hour violations to Prime and the California Labor and Workforce Development Agency (LWDA). He filed his PAGA action a few months later, and sent an amended LWDA notice in October 2019. In his operative second amended complaint, filed in February 2020, Domingo asserted six violations: meal and rest period, minimum wage, overtime, wage statement, failure to reimburse, and failure to pay wages upon separation.

The case proceeded to discovery, and the trial court appointed a referee. The referee recommended denial of Domingo's motion to compel production of all nonexempt employee time records and wage statements on grounds including timeliness, which the court adopted. In briefing before the referee, Domingo had indicated that if Prime supplied certain information, he did not need all of the records. Prime subsequently provided similar information in response to special interrogatories.

3

In February 2021, both parties moved for summary judgment and/or adjudication. In June 2021, the trial court denied Domingo's motion, and most of Prime's motion.

C.    *Trial, Motion for Judgment, and Statement of Decision*

The case proceeded to a three-day bench trial in August 2021. Domingo called six witnesses: himself; Quinonez; Granger; Filifili Amiatu, Prime's Corporate Payroll Director; Durand Hartin, Prime's Regional Security Manager; and his expert, Bennett Berger. Amiatu "support[ed] the payroll staff" with "payroll processing and pay practices." Hartin managed security employees, which included enforcing rules. Berger's consulting firm "conduct[ed] expert analysis" for employment class actions. Domingo also entered a number of exhibits into evidence, including the employee handbook, a JBDev document describing Prime's rounding and grace period policy, and time records and wage statements for Domingo and Granger.

After Domingo rested, Prime moved for judgment under Code of Civil Procedure section 631.8, which Domingo opposed. The trial court issued a tentative ruling, granting Prime's motion. Domingo filed a request for statement of decision, and identified 15 purportedly omitted "principal controverted issues." The court's proposed statement of decision stated the requests were "essentially . . . special interrogatories" it did not have to address, but it still added responses to certain concerns. Domingo filed objections, contending the court failed to resolve his stated issues. The court overruled the objections, and adopted the proposed statement as its Statement of Decision.

In the Statement of Decision, the trial court first described the procedural history and applicable law. The court then discussed the evidence in detail, and made credibility findings. The court found Amiatu was "very

4

credible"; Hartin was "solid, candid and credible"; and Quinonez was "very thorough and credible despite the fact she arguably had an axe to grind against defendant for having terminated her involuntarily." The court also commented on specific testimony, including, for example, finding Amiatu and Quinonez more credible on meal and rest break practices than Domingo and Granger.

The trial court then set forth its rulings (described further *post*): (i) Prime's meal period timekeeping system (which did not permit clocking back in early) was lawful, as it provided ways to record short meals and was intended to promote compliant meal periods; (ii) Domingo did not otherwise prove meal period or rest break violations; (iii) he did not establish unpaid reimbursement or compensation based on out-of-work communications; (iv) Prime's rounding and grace period policy was neutral, facially and in practice; (v) Prime properly calculated the regular rate, including as to shift differentials; (vi) time spent complying with rules for free parking and badge access was not compensable; (vii) listing "hours worked" as a decimal in wage statements was permissible; and (viii) Domingo did not prove Prime failed to timely pay his final wages. The court also found he did not establish the claims were representative.

The trial court entered judgment for Prime, and Domingo appealed. We requested and received supplemental briefing on issues relating to Prime's rounding policy.

## DISCUSSION

Domingo contends the trial court erred by denying his motion to compel discovery. He also challenges the court's determinations as to each alleged violation. We conclude he establishes reversible error only as to Prime's rounding policy.

A.     *Overview of Applicable Law*

1.     *California Wage and Hour Law and PAGA*

In California, "wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC." (*Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 61 (*Donohue*).)  Wage Order 5 "applies to persons employed in the public housekeeping industry," which includes hospitals.  (*Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 839, fn. 8 (*Mendiola*); Cal. Code Regs., tit. 8, § 11050, subds. 1, 2(P)(4).)[3]

PAGA "authorizes an employee to bring an action for civil penalties on behalf of the state against his or her employer for Labor Code violations committed against the employee and fellow employees, with most of the proceeds of that litigation going to the state." (*Iskanian v. CLS Transp. Los Angeles, LLC* (2014) 59 Cal.4th 348, 360, abrogated on another ground by *Viking River Cruises, Inc. v. Moriana* (2022) ___ U.S. ___, 142 S.Ct. 1906, 1924.)  Before filing suit, the employee "must provide notice to the employer and the [LWDA] 'of the specific provisions of [the Labor Code] alleged to have been violated, including the facts and theories to support the alleged

_____

[3]     The parties agree Wage Order 5 applies here, but disagree as to its application to certain claims.  Specifically, Prime contends Wage Order 5 applies the FLSA definition for "hours worked" to the health care industry, and precludes liability based on out-of-work communications, rounding, and parking/badge access.  Domingo disagrees.  Because we affirm on communications and parking/badge access, we need not and do not address Wage Order 5 in those contexts.  We also need not resolve the issue in the rounding context, as we discuss *post*.

6

violation.' " (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 545 (*Williams*).)

2.      *Code of Civil Procedure Section 631.8*

Under Code of Civil Procedure section 631.8, "[a]fter a party has completed his presentation of evidence in a trial by the court, the other party . . . may move for a judgment." (*Id*. at subd. (a).)

The purpose of this section " ' "is 'to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact.' [Citation.]  Under the statute, a court acting as trier of fact may enter judgment in favor of the defendant if the court concludes that the plaintiff failed to sustain its burden of proof.  [Citation.]  In making the ruling, the trial court assesses witness credibility and resolves conflicts in the evidence." ' [Citation.]  ' "Because the trial court evaluates the evidence as a trier of fact, it may refuse to believe some witnesses while crediting the testimony of others." ' " (*Orange County Water Dist. v. MAG Aerospace Industries, Inc.* (2017) 12 Cal.App.5th 229, 239 (*MAG Aerospace*).)

3.      *Standard of Review*

The standard of review for a judgment under Code of Civil Procedure section 631.8 is " ' "the same as if the court had rendered judgment after a completed trial—that is, in reviewing the questions of fact decided by the trial court, the substantial evidence rule applies." ' " (*MAG Aerospace, supra,* 12 Cal.App.5th at p. 239.)  " ' "We review legal issues . . . under a de novo or independent standard." ' " (*Id*. at pp. 239–240.)

In applying substantial evidence review, the "power of the reviewing court begins and ends with the determination as to whether, on the whole record, there is substantial evidence, contradicted or uncontradicted, that will

support the trial court's determination." (*San Diego Metro. Transit Dev. Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528 (*SD Metro*); *ibid.* [appellate court "views the evidence in the light most favorable to the respondents [citation], resolves all evidentiary conflicts in favor of the prevailing party and indulges all reasonable inferences possible to uphold the trial court's findings"]; see *Ford v. Miller Meat Co.* (1994) 28 Cal.App.4th 1196, 1200 (*Ford*) [we "do not reweigh the evidence or reassess issues of credibility"].)

We also "must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision," unless a party timely files objections identifying omissions or ambiguities. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48.) We review "implied factual findings under the substantial evidence standard." (*Id.* at pp. 59–60.)

Domingo contends we should apply de novo review because the trial court stated there were "unresolved issues of law" (citing a comment at the motion in limine hearing), and "[m]ost of the facts . . . were undisputed." We disagree. To the extent this appeal presents issues of law, we do review them de novo. (*MAG Aerospace*, *supra*, 12 Cal.App.5th at pp. 239–240.) But Domingo's assertion that most facts were undisputed appears to rest on his substantially one-sided description of the record in his opening brief. The record reflects multiple factual disputes, and the parties disagree on the inferences to be drawn from it. (See *Bower v. Inter-Con Security Systems,*

*Inc.* (2014) 232 Cal.App.4th 1035, 1043 ["Independent review is appropriate only when the facts permit just one reasonable inference."].)[4]

4.     *Appellate Briefing Requirements*

An appellant's opening brief must "fairly set forth all the significant facts, not just those beneficial to the appellant." (*In re S.C.* (2006) 138 Cal.App.4th 396, 402; see rule 8.204(a)(2)(C) [brief must "[p]rovide a summary of the significant facts"].) An appellant who challenges the sufficiency of the evidence has to " 'set forth in their brief *all* the material evidence on the point and *not merely their own evidence*,' " or the " 'error . . . is deemed to be waived.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*).)

An appellant also must raise all points in the opening brief, or seek leave for supplemental briefing. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178 (*Raceway*) ["We generally do not consider arguments raised for the first time in a reply brief."]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764– 766 [refusing to consider new issues on reply; counsel could have "sought permission to file a supplemental opening brief"]; *Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2019) 43 Cal.App.5th 988, 1002 (*Rincon*) ["If plaintiffs wished to add an argument based on [a case decided after their

---

4     Domingo also argued in his opening brief that "on appeal from a defense motion for judgment, the truth of plaintiff's evidence must be assumed," citing *Franco W. Oil Co. v. Fariss* (1968) 259 Cal.App.2d 325, 328– 329. *Franco* was distinguishing a motion for nonsuit in a jury trial. On reply, he then cited *Greening v. General Air-Conditioning Corp.* (1965) 233 Cal.App.2d 545, 555 to argue that, in review of a motion for judgment, evidence can be discounted but "not . . . ignore[d]." That part of *Greening* addressed how to apply a res ipsa loquitur inference to a negligence claim in the motion for judgment context, and is inapposite. (Cf. *ibid.* [affirming judgment on breach of contract and warranty claims].)

opening brief], they should have sought leave to file a supplemental opening brief . . . , rather than saving the issue for reply"].)

Finally, briefing must be supported by reasoned argument, authority, and accurate citation to the record. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 (*Badie*) ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."]; *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 ["[W]e may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record."].)

Here, Domingo's opening brief contains a largely one-sided description of the record, as noted, and his reply brief has multiple new arguments. Both parties filed new authority letters containing argument, prior to our request for supplemental briefing, which was improper as well. (Rule 8.254(b) ["No argument or other discussion of the authority is permitted in the letter."].) Domingo's reply brief has two further issues. He contends Prime concedes certain points by not addressing them. But a "respondent's failure to address an issue raised in the opening brief" (much less in a new authority letter) is "not a concession." (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 557, fn. 48.) He also cites an unreported decision. (*People v. Gray* (2014) 229 Cal.App.4th 285, 292, fn. 15 ["It is improper to cite or rely upon unpublished opinions."]; rule 8.1115(a).)

With these considerations in mind, we turn to Domingo's arguments.

B.     *Domingo Does Not Establish Prejudicial Error As To Discovery*

Domingo argues the trial court erred by adopting the referee's recommended denial of his motion to compel time and wage records. He does not establish any prejudicial abuse of discretion.

10

1.   *Additional Facts*

In May 2019, Domingo served document requests, including for time records and wage statements for all non-exempt employees.  Prime objected.  After initial deposition notices, Domingo served a second amended "Personal Most Knowledgeable" (PMK) notice, with document requests that included time and wage records.  Prime again objected.  Domingo served subsequent amended PMK deposition notices, without document requests.

In December 2019, Domingo sought ex parte relief to compel a *Belaire-West* notice.[5]  In its minute order, the trial court "set[] a Motion to Compel re *Belaire-West*" to be heard in January 2020.  The next day, Domingo filed a "Motion To Compel Attendance Of [Prime's PMK] And Document Production; Motion To Compel *Bel-Aire West* Notice."  Prime opposed, and Domingo filed a reply.  The court declined to rule on the motion, and appointed Judge Herbert Hoffman (retired) as discovery referee.

The referee held multiple conferences during the spring of 2020.  The *Belaire-West* process was completed by February 2021.  Prime represents, and Domingo does not dispute, that Domingo received contact information for 1,504 employees.

In April 2021, the referee entered his fifth report and recommendation, the one at issue here.  He stated, "[Domingo] filed a motion to compel requesting that [Prime] be compelled to produce six categories of documents as well as . . . the depositions of two non-party witnesses.  [Prime] opposed

---

[5]   "In wage and hour class actions, a *Belaire-West* notice is sent to putative class members to inform them that their contact information will be disclosed unless they timely object to such disclosure in writing."  (*Garcia v. Haralambos Beverage Co.* (2021) 59 Cal.App.5th 534, 539, fn. 3, citing *Belaire-West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554.)

11

this motion. In [his] reply brief, [Domingo] changed [his] request to demand four categories of verified statements of information . . . ." The referee does not include filing dates, but appears to mean a later-filed motion to compel, not the one from December 2019. The record does not contain a later motion to compel, but does have an April 2021 reply brief matching the referee's description.[6] There, Domingo indicated that if Prime provided certain information, he "would agree that he does not require all of the Time Records and Wage Statements at issue" (while maintaining he remained entitled to the records).[7]

The referee then recommended denial of the motion, stating Domingo did not move within the statutory deadline and did not address timeliness in his motion or reply brief. He indicated that even if the motion were timely, he would deny it, because Domingo did not make a prima facie showing of violations and there were inadequate meet and confer efforts. He also stated,

---

[6]  The record also has emails discussing a briefing schedule in February and March 2021. Prime represents Domingo filed the later motion to compel on March 29, 2021.

[7]  He requested: "1. <u>Regular Rate / Overtime Issue</u> [¶] a. . . . number of Pay Periods in which Prime employees (1) received a 'shift differential' and (2) worked Overtime . . . ; [¶] b. . . . number of Pay Periods in which Prime employees worked . . . for a time period of 7 hours and 48 minutes or longer. . .; [¶] c. . . . number of Pay Periods in which Prime employees worked . . . for a time period of 8 hours or longer"; "2. <u>Meal Period Issue</u> [¶] a. . . . number of Pay Periods in which Prime employees experienced at least one Meal Period . . . ; [¶] b. . . . number of Pay Periods in which Prime employees were subject to the Meal Period 'Lockout System' "; "3. <u>Rest Period Issues</u> [¶] . . . number of Pay Periods in which Prime employees experienced at least one Rest Period; and "4. <u>Wage Statement Issues</u> [¶] the. . . . exact number of Pay Periods in which Prime employees received an Itemized Wage Statement . . . ." (Some emphasis omitted.)

"Based upon all of the briefing, it is unclear what [Domingo] was actually asking for."

Domingo objected to the recommendation. In a declaration filed with its response, Prime's counsel noted they previously proposed he "could obtain the information he seeks via interrogatories . . . ."

In May 2021, the trial court adopted the referee's recommendation. It noted Domingo remained "free to propound the interrogatories suggested in . . . [Prime's counsel's] most recent declaration."

Domingo propounded special interrogatories for similar information as identified in his April 2021 reply brief. In June 2021, Prime served responses. It indicated that during the relevant time, there were "14,270 pay periods" in which employees "received a shift differential and overtime"; "66,683 pay periods in which [they] worked at least 7 hours and 48 minutes"; "60,012 pay periods where [they] worked more than 8 hours"; and "70,112 pay periods where [they] received a meal period." Prime also indicated there were 71,314 pay periods where "the meal period 'lockout system' was in effect"; "employees received a rest period," and they "received an itemized wage statement." In July 2021, payroll director Amiatu signed a declaration, which stated there were "36,227 pay periods" in which an "employee worked between 8 hours and 8 hours and 12 minutes and, pursuant to Prime's grace period practice, was paid for 8 hours worked."

At trial, Domingo's counsel referenced some of this pay period information in his opening statement, and Amiatu was examined about certain information. The interrogatory responses were identified at trial as Exhibit 72, and Amiatu's declaration was identified as Exhibit 91.

13

2.     *Applicable Law*

"We review the trial court's grant or denial of a motion to compel discovery for an abuse of discretion.  [Citation.]  The statutory scheme vests trial courts with ' "wide discretion" ' to allow or prohibit discovery." (*Williams, supra,* 3 Cal.5th at p. 540.)  An appellant also must " 'show not only that the trial court erred, but also that the error was prejudicial'; i.e., . . . that it is reasonably probable the ultimate outcome would have been more favorable to the [appellant] had the trial court not erred in the discovery rulings." (*MacQuiddy v. Mercedes–Benz USA, LLC* (2015) 233 Cal.App.4th 1036, 1045.)

3.     *Analysis*

As a preliminary matter, it is not clear the record is adequate for our review.  The motion to compel at issue—the one presumably filed around March 2021 and addressed by the referee—does not appear to be in the record.  Domingo also did not include the interrogatory responses in his appendix; Prime added them in its respondent's appendix.  (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 ["[A] party challenging a judgment has the burden of showing reversible error by an adequate record."]; *Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 259 [appellants "had an affirmative obligation to provide an adequate record so that we could assess whether the court abused its discretion"].)

But even if the trial court erred in adopting the referee's denial of Domingo's motion to compel, he does not establish prejudice.

Domingo conceded in his April 2021 reply brief that he did "not require all of the Time Records and Wage Statements at issue" if Prime provided certain information.  Prime served responses with this information in June 2021, a month and a half before trial; Amiatu provided a declaration with

14

more information; and these documents and the information therein were addressed at trial, including by Domingo's counsel.  Yet, Domingo did not address the interrogatory responses in his opening brief here, and forfeits any argument that he could have achieved a better result with the requested documents than with the interrogatory responses.  (*Raceway*, *supra*, 2 Cal.5th at p. 178.)  On reply here, Domingo belatedly acknowledges the interrogatory responses, but still does not offer any reasoned argument why they were insufficient for most of the alleged violations.  (*Badie, supra,* 67 Cal.App.4th at pp. 784–785.)  The prejudice arguments he advances in his opening brief are not persuasive.

First, Domingo argues he was "forced . . . to prove PAGA violations on a representative basis without any discovery as to Prime's other nonexempt employees."  That is not accurate.  Prime's interrogatory responses provided this kind of information, as did Amiatu's further declaration.  Further, to the extent Domingo is essentially arguing certain Prime practices are unlawful (e.g., how it includes shift differentials in the regular rate), he does not explain how having actual time and wage records could have made any difference in his case presentation.

Second, Domingo contends "contact information and relevant employment records" for other employees are "routinely discoverable as an essential prerequisite to effectively seeking group relief, without . . . good cause," citing *Williams*, *supra*, 3 Cal.5th at p. 538.  *Williams* indicated *contact information* was warranted without good cause, not document demands.  (*Ibid.*)  Domingo did receive contact information, for over 1,500 employees.  *Williams* did not involve a situation akin to this one, where a plaintiff acknowledged he could rely on employer-provided information.  (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343.)

Finally, Domingo argues the trial court "repeatedly lamented [his] failure to establish his claims on a representative basis, appearing to reject certain established violations on such grounds," noting on reply that it was the court that denied him representative discovery. We reject his characterization of the court's decision. The court noted some of the pay period information, reflecting it considered the discovery as to other employees that Domingo did obtain. Domingo does not provide any explanation or examples for his claim that the court "appear[ed] to reject certain established violations" for lack of representative proof. In any event, he has to show he could have achieved a better result with the time and wage records, not just that the court's rulings were inconsistent. He fails to do so, and does not establish reversible error.

C.      *Meal Periods*

Domingo contends the trial court erroneously concluded he did not establish meal period violations, in light of Prime's meal period timekeeping system, purported admission to violations during an event known as Hospital Week, and payment of meal period penalties. We reject each contention.

1.      *Additional Facts*

Prime's meal period policy provides for a duty-free, 30-minute meal period. Amiatu testified about the meal period timekeeping system and related records, while Domingo, Granger, and Quinonez testified about meal periods in practice, including during Hospital Week.

For the meal period timekeeping system, Amiatu stated that if an employee tries to clock back in early, "an error . . . appears on the time clock with the time indicating when their 30-minute meal break will be complete." She explained Prime "want[s] to make sure that employees do take their 30-minute uninterrupted," and there were two ways to record the time if

16

employees were called back early. First, they could "fill[] out the . . . timekeeping authorization form, submit [it] to their manager, and [the manager] can fix it right away." Second, they could "wait until the end of their shift to enter in that time." Employees also could "always go back" and check their time record at the time clock.

Amiatu explained that when employees "clock[] out at the end of their shift, an attestation will appear on the screen," and by choosing "agree," they attest "they took their . . . meal, their rest period, and . . . did not work any unauthorized overtime or off the clock work." If they chose "disagree," a second screen appeared, which allowed the employee to identify issues, including "Work Load Prevented Meal Period" and "I Chose Not To Take A Required Meal Period."[8] Attestation records for Domingo and Granger showed each always selected "agree." Amiatu also addressed Prime's payment of meal premiums (which we address *post*), and said an employee who chose not to take a meal did not receive a premium, but was "paid for all their hours worked."

Amiatu also described the "time record audit trial," which reflected edits. She testified Domingo's audit trail from March 2018 to January 2019 (i.e., the beginning of the relevant time period, through his termination) showed he made eight edits, six involving meals. Based on this, Amiatu understood he knew how to "manually enter his meal break," and "edit . . . or input his time . . . at the clock." She said Granger made seven edits, which showed "he knew how to submit edits for his meal period punches."

---

[8]    There was also an option for "Took Meal Period Forgot to Swipe." "Workload Prevented" and "Chose Not to Take" were options for rest periods, too.

17

Domingo testified "most of the time [they were] being called back to work" from meal breaks to help other employees. He further testified that on the Monday of Hospital Week in 2018, Quinonez told them "don't take your break." He first said they "were told not to punch out," but then denied recalling if he punched out. His time records did not show a missing meal. Domingo admitted he was trained to take a 30-minute meal period, was "not to work off the clock," and could refuse to work during his meal break (but would not receive the extra hour of pay if he chose to work). As for the attestation and time edits, Domingo remembered being told to "just click on agree," and when asked if he edited time punches, said he was "not in the position" to edit his time. He did not know about practices for meal and rest breaks in other departments (or for overtime, timekeeping, reimbursements, or off-the-clock work).

Granger was asked by Domingo's counsel if he always received "30 minutes uninterrupted" for his meal break. When he said yes, counsel asked if was "ever interrupted," and he responded "Yes, sometimes," by Quinonez. Granger testified Quinonez told them to work during one day of Hospital Week, though he did not recall the day, and stated he "didn't punch out." He estimated there were nine other kitchen employees working at the time. The trial court deemed cross-examination by Prime waived, stating it did not think Granger's testimony "added anything" and he "was just not a creditable witness."

Quinonez testified Domingo never told her he was not receiving full meal breaks, or complained he "could not record the actual end of his meal period." She denied she told him or any other employee to clock out but continue working. When asked if she ever called Domingo back early from a meal break, she said the "only time [she] can remember where . . . that might

18

have—where that did happen" was Hospital Week, when she "can remember calling folks back." She said "human resources was involved"; "appropriate adjustments" were made to time cards; and employees were given "meal penalties that they were due." Quinonez later testified she "did call [Domingo] back," they gave him a meal period penalty, and she believed the payroll system would reflect this.

The trial court summarized the foregoing testimony. It did not find compelling Domingo's claim that he was usually called back early from meals, and did not find credible his claim that he was just told to click "agree." It also observed Domingo was "[u]naware of meal and rest period" practices in other departments. The court found Granger's testimony about his meals being interrupted "[s]ounded scripted," and noted it had waived cross-examination.

The trial court then set forth its rulings. First, the court found Domingo did not prove the meal period timekeeping system led to Prime "masking short meal periods" or "failing to maintain accurate . . . records." It found employees "if necessary, could still accurately record a short meal period, explaining, "The system provides two methods for employees to claim a meal period premium on those rare occasions (one day during hospital week) where the meal period was foreshortened. The evidence was that kitchen employees knew they could edit their time and did so." The court determined the system was Prime's "reasonable effort to ensure and promote compliance with the Labor Code" under *Brinker v. Superior Court* (2012) 53 Cal.4th 1004, 1040 (*Brinker*). The court also found the "evidence did not preponderate in favor of a finding that this claim was representative."

Second, the trial court found Domingo "did not make out a PAGA claim for meal and rest period violations," in general. It found the "evidence easily

19

preponderated in favor of a finding that [Prime's] meal and rest period policies were facially lawful." The court "found the testimony of [Amiatu] and [Quinonez] more credible than that offered by [Domingo] and [Granger] on how those policies were carried out in the day-to-day operation of the kitchen." The court again found the evidence did not favor a finding that the claim was representative.

    2.    *Applicable Law*

"Under California law, employers must generally provide employees with one 30-minute meal period that begins no later than the end of the fifth hour of work and another 30-minute meal period that begins no later than the end of the 10th hour of work." (*Donohue, supra,* 11 Cal.5th at p. 61, citing § 512; Wage Order 5, subd. 11(A) [requiring meal periods consistent with § 512].)

The California Supreme Court set forth in *Brinker*, and reiterated in *Donohue*, the following rules:  "An employer is liable only if it does not provide an employee with the opportunity to take a compliant meal period. The employer is not liable if the employee chooses to take a short or delayed meal period or no meal period at all. The employer is not required to police meal periods to make sure no work is performed. Instead, the employer's duty is to ensure that it provides the employee with bona fide relief from duty and that this is accurately reflected in the employer's time records. (*Donohue, supra*, 11 Cal.5th at p. 78; see *Brinker, supra*, 53 Cal.4th at pp. 1040–1041.)

"If an employer does not provide an employee with a compliant meal period, then '[it] shall pay the employee one additional hour of pay' " at the employee's regular rate. (*Donohue, supra,* 11 Cal.5th at p. 61, citing § 226.7, subd. (c).)  "In addition to providing premium pay, the employer must

20

compensate the employee for any time worked during the meal period if 'it "knew or reasonably should have known that the worker was working through the authorized meal period." ' " (*Donohue*, at p. 68, citing *Brinker*, *supra*, 53 Cal.4th at p. 1040, fn. 19.)

An employer also has a "duty to maintain accurate records of meal periods." (*Donohue*, *supra*, 11 Cal.5th at p. 76; Wage Order 5, subd. (7)(A), 7(A)(3) [employer shall keep "accurate information" as to employees, including time records showing "[m]eal periods"].)

3.     *Analysis*

a.     *Meal Period Timekeeping System*

Domingo argues the trial court's ruling was contrary to the record and the California Supreme Court's decision in *Donohue*. We disagree.

First, he contends the undisputed evidence showed that due to Prime's timekeeping system (which he calls a "lockout system"), employees "were not (at times) able to accurately record" meal break returns, and he himself "was often required to . . . return to work 'early,' " could not record these early returns, and did not receive penalties. But the evidence and inferences as these issues *were* disputed and the trial court rejected Domingo's position, so he is functionally asking us to reweigh the evidence. We may not do so. (*Ford*, *supra*, 28 Cal.App.4th at p. 1200.)

Even if Domingo had preserved a substantial evidence challenge to the trial court's findings, the record supports them. Amiatu's testimony reflected Prime intended for employees to take compliant meal breaks, and employees still had two methods to record short meals that did occur (i.e., submitting a form, or adjusting the time at shift-end). The evidence also showed employees knew how to use these methods, including the edits in Domingo's and Granger's audit trails; Amiatu's testimony that these records reflected

21

they knew how to record meals; and their attestations, which indicated they received meal breaks. The court did not find credible Domingo's claim that he was told to just click "agree" for the attestation, and could impliedly reject his testimony that he could not edit time.

Second, Domingo argues Prime's timekeeping system is inconsistent with *Donohue*. We reject this argument as well.

In *Donohue*, the employer's timekeeping system rounded meal period "time punches to the nearest 10-minute increment." (*Donohue*, *supra*, 11 Cal.5th at p. 62.) If there was a missed, short, or delayed meal (after rounding), a drop-down menu let the employee choose an option indicating why. (*Id*. at pp. 62–63.) Employees also could ask for manual adjustments, and had to sign a certification at the end of each biweekly pay period that meals were received. (*Id*. at p. 63.) The plaintiff brought a class action, this court affirmed summary judgment for the employer, and the California Supreme Court reversed. (*Donohue*, *supra*, 11 Cal.5th at pp. 61, 63–64.)

The Court held employers "cannot . . . round[] time punches . . . in the meal period context." (*Donohue*, *supra*, 11 Cal.5th at p. 61.) The Court also held "time records showing noncompliant meal periods raise a rebuttable presumption of meal period violations, including at the summary judgment stage." (*Ibid*.) The Court stated, in part:

> "It is important that employers keep accurate records so that enforcement agencies can ' "adequately investigate and enforce" a wage order's meal period provisions.' [Citation] . . . . If the records are accurate, then the records reflect an employer's true liability. . . . If the records are incomplete or inaccurate—for example, the records do not clearly indicate whether the employee chose to work during meal periods despite bona fide relief from duty—then the employer can offer evidence to rebut the presumption."

(*Id.* at p. 76.)  The Court also disagreed the presumption required employers to "police meal periods," explaining it "[i]nstead . . . requires giv[ing] employees a mechanism for recording their meal periods and to ensure that employees use the mechanism properly."  (*Ibid.*)

Domingo contends Prime's meal period timekeeping system failed to produce accurate records, thus raising a " 'rebuttable presumption' of Labor Code violations," which the court failed to apply.  He also contends the court improperly permitted Prime to " 'shift[] the burden' to keep accurate time records" to employees.  We are not persuaded.

First, Domingo appears to assume *Donohue*'s rebuttable presumption analysis applies here, despite a different procedural posture and facts.  The factual differences alone show the analysis does not neatly apply.  In *Donohue*, employees punched in and out for meals when they chose, but the employer rounded the punches—resulting in records that did not reflect the actual meal periods.  Here, Prime intended for employees to *actually take* 30-minute meal periods, while providing same-day methods to record short meals.  There is nothing intrinsically inaccurate about Prime's records.

Even if the trial court should have applied a rebuttable presumption of meal period violations, Domingo does not establish prejudice.  (*Navigators Specialty Ins. Co. v. Moorefield Constr., Inc.* (2016) 6 Cal.App.5th 1258, 1287–1288 ["[m]isallocation of the burden of proof in a bench trial is not reversible error per se but must be prejudicial to warrant reversal"; if substantial evidence supports finding, misallocation is harmless].)  Employers must give employees a way to record meal breaks and ensure they use it properly.  (*Donohue*, *supra*, 11 Cal.5th at p. 77.)  When the presumption applies, the employer can present evidence that employees were "compensated for noncompliant meal periods" or "provided compliant meal periods during

23

which they chose to work." (*Ibid*.) The record contained evidence on these matters: Prime used a timekeeping system that encouraged full meal periods, but still provided ways to record noncompliant ones; employees could indicate what happened (including that they "chose" to work); and Prime paid premiums and/or compensation as applicable. On this record, the court could find Prime's system did not violate meal period requirements, notwithstanding any contrary presumptions.

Second, Domingo does not establish Prime's system improperly shifted the recordkeeping burden to employees. In stating employees must supply a mechanism to record meal breaks, *Donohue* contemplates employers can require use of such mechanisms. (*Donohue*, *supra*, 11 Cal.5th at p. 77; cf. *id.* at p. 68 [employer must pay for time worked during meal breaks if it knew or should have known about it].) The California Supreme Court took issue with the drop-down menu there to log meal issues, because it was triggered by rounded punches. (*Id.* at p. 80 [system "would have ensured accurate tracking of meal period violations if it had simply omitted rounding"].) The Court also found the biweekly certifications there were inaccurate to the extent they required employee to keep their own records. (*Id.* at pp. 80–81.) Here, in contrast, Prime employees would know about a potentially short meal break, because the time clock would tell them to return after 30 minutes. If they ended up working, they could fix it right away, or address it in their end-of-shift attestation just *hours* later—with no need to keep records.

> b.     *Hospital Week*

The trial court referenced "rare occasions (one day during hospital week) where the meal period was foreshortened," in finding employees could accurately record a short meal if needed. Domingo argues uncontroverted

24

evidence established there were meal period violations during Hospital Week, including on a representative basis. The inferences to be drawn from the evidence were not undisputed, and substantial evidence supports the court's implied finding that the Hospital Week evidence was insufficient to prove meal period violations.

Domingo and Granger said they were called back to work on one day of Hospital Week, but Domingo's time records did not show a missed meal, and both agreed in their attestations that they received meal breaks. As for Quinonez, she did say she called Domingo and others back that week, human resources was involved, and the payroll system would reflect he received a penalty. But she supervised numerous employees, initially only said she "might" have called Domingo back, and Domingo and other employees could have chosen to work. (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830 (*Daniel G.*) [trier of fact "may believe . . . part of a witness's testimony"; "[o]n appeal, we must accept that part of the testimony which supports the judgment"].) Further, Quinonez worked in food service, not human resources or payroll, and Amiatu, who did work in payroll, testified Domingo and Granger knew how to record meals.

Viewing this record in the light most favorable to the judgment, the trial court impliedly could find that even if there were potentially short meals during Hospital Week, Domingo did not prove violations based on them.

c.    *Payment of Premiums*

Finally, Domingo argues Prime's payment of meal break premiums "established liability for meal period violations." He makes the same argument for rest break penalties. We reject both.

Section 226.7, subdivision (c), provides that "[i]f an employer fails to provide an employee a meal or rest . . . period . . . , the employer shall pay the

25

employee one additional hour of pay at the employee's regular rate of compensation . . . ."

Amiatu testified that during the relevant time period, Prime paid 6,207 meal period premiums and 1,058 rest break premiums. She explained that when an employee chose "Workload Prevented" for a meal or rest period, Prime did not "do any independent investigation to determine" if it happened; rather, they "just pay." When Domingo's counsel asked if Prime paid meal period penalties "because [it] concluded that there were meal period violations," Amiatu said, "That's correct." His counsel tried to elicit similar testimony on rest breaks, but she testified they "pay based on what the employee elected," and she was "unaware of any" occasion when Prime disputed an employee missed a break, reiterating, "because we pay."

The trial court could impliedly find Prime's payment of premiums, without more, did not prove it failed to provide compliant meal or rest breaks. Although Amiatu indicated at one point that meal period premiums were based on violations, she mostly testified consistently that Prime paid premiums without investigating if a violation actually occurred. The court could credit that testimony, and decline to focus on the inconsistent response. (*Daniel G.*, *supra*, 120 Cal.App.4th at p. 830.) In turn, the court could find that, absent confirmatory investigation, the premium payments just reflected employees claimed they did not receive breaks—not that Prime failed to provide them. (Compare *In re Automobile Antitrust Cases I & II* (2016) 1 Cal.App.5th 127, 149 [by "engaging in this review and revision process," executive "clearly manifested his belief in the accuracy of the meeting minutes"]; *SD Metro*, *supra,* 73 Cal.App.4th at p. 528 [we "indulge[] all reasonable inferences possible to uphold the trial court's findings"].)

Domingo argues that "[t]o the extent the trial court implicitly relied on Prime's payment of the penalties as excusing its liability, the California Supreme Court has repeatedly rejected the notion that an employer can avoid liability for violating § 226.7 merely by paying meal period premium penalties," citing *Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244 (*Kirby*) and *Kim v. Reins Int'l Cal., Inc.* (2020) 9 Cal.5th 73 (*Kim*). (See *Kirby*, at p. 1256 [attorney fees issue; "provision of an additional hour of pay does not excuse a section 226.7 violation"]; *Kim*, at p. 84 [PAGA standing after individual plaintiff's settlement; "payment of this statutory remedy 'does not excuse' " violation].)

But, again, the trial court could find the premium payments did not establish violations in the first place, such that it would not reach the issue of whether liability was excused. Should Domingo seek to rely on *Kirby* and *Kim* to suggest penalties can establish violations, without more, that reliance is misplaced. If anything, they underscore the penalty is separate from the violation, and proof of the violation is necessary. (See *Kirby*, *supra*, 53 Cal.4th at pp. 1256–1257 ["failure to provide an additional hour of pay does not form part of a section 226.7 violation . . . . failure to provide required meal and rest breaks is what triggers a violation"]; *Kim, supra*, 9 Cal.5th at p. 84 ["The remedy for a Labor Code violation . . . is distinct from the fact of the violation itself."].)

C.    *Rest Breaks*

In addition to his rest break argument based on premium payments (which we have rejected), Domingo contends the trial court failed to consider Prime's rest break policy in practice. This contention lacks merit, too.

1. *Additional Facts*

Prime's rest break policy provides for one duty-free, 10-minute rest break for every four hours of work. Amiatu testified that, as with meal periods, employees had two ways to report rest break issues: submitting a form at the time to the manager, or selecting "workload prevented" during the end-of-shift attestation process.

Domingo testified he usually took his first rest break and his second break was scheduled, but he was "not able to take it" two or three times a week because it was "really busy." He subsequently testified he was contending he "never took" his second rest break. He "never told anyone in management" he was "unable to take [his] second rest break." Granger denied taking "any rest breaks," explaining they were busy.

Quinonez denied supervisors knew employees were not taking second breaks due to kitchen rushes, and said they "were rigorous about encouraging and reminding and directing employees to take their breaks as scheduled." She testified Domingo never complained to her that he could not take a second rest break, and she had no knowledge of Granger working through rest breaks. She acknowledged Domingo generally arrived at work before her, and that if Granger "[took] his break at other than his scheduled time" when she was at home, she would not know.

The trial court described the testimony regarding rest breaks, including that Domingo acknowledged his second rest break was scheduled, but he claimed he could not take it, and that Granger said he never received rest breaks. The court determined Domingo did not establish a rest break violation. As with the meal periods, the court found the rest break policy was facially lawful; Amiatu and Quinonez were "more credible" than Domingo and Granger regarding how the policy was "carried out in the day-to-day

operation of the kitchen," and the evidence did not reflect the claim was representative.

2.    *Analysis*

Domingo argues the trial court "fail[ed] to consider the unrebutted evidence of rest period violations," and erroneously analyzed "the language of the rest period policy only." (Some capitalization omitted.) This argument mischaracterizes the court's ruling and the record, and we reject it.

"California law requires employers to relieve their employees of all work-related duties and employer control during 10-minute rest periods." (*Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 272; § 226.7, subd. (b) ["An employer shall not require any employee to work during a . . . rest . . . period mandated" by IWC wage order]; Wage Order 5, subd. 12(A) [requiring 10 minutes net rest time per four hours worked].)

First, the trial court's findings and analysis make clear it considered whether the rest break policy was compliant in practice. It acknowledged Domingo and Granger's testimony about not receiving certain or all rest breaks (noting Domingo admitted his second one was scheduled), and still concluded, as with meal periods, that Amiatu and Quinonez were more credible about how the rest break policy was "carried out in the day-to-day operation of the kitchen. . . ." That the court set forth certain findings on meal and rest periods concurrently does not, as Domingo asserts, establish the "court failed to even distinguish between [them]."

Second, the evidence was disputed. Domingo and Granger testified they missed breaks because the kitchen was busy, but Quinonez denied supervisors knew of missed breaks due to kitchen rushes and, to the contrary, said they "remind[ed] and direct[ed]" employees to take their breaks. This evidence was for the trial court to weigh, not us. (*Ford*, *supra*,

29

28 Cal.App.4th at p. 1200.) Domingo suggests his and Granger's testimony established violations because no witness rebutted each assertion, and Quinonez was not always present while they were working. The court could reject their testimony because it *did not believe them*. (*MAG Aerospace, supra*, 12 Cal.App.5th at p. 239 [court "may refuse to believe some witnesses"]; see *Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 836 [provided trier of fact " 'does not act arbitrarily . . . , it may reject the testimony of a witness even though the witness is uncontradicted' "]; *ibid.* ["The fact that [appellant] testified to such payments did not obligate the court to accept that testimony."].)

Finally, even if we construed Domingo's argument as a substantial evidence challenge, we would reject it. Again, the court expressly found Quinonez more credible than Domingo and Granger regarding kitchen operations. Her testimony was evidence that Prime provided compliant rest breaks, consistent with its policy, to Domingo and other employees.

D.    *Out-Of-Work Communications*

Domingo argues the trial court erroneously determined he did not establish violations based on unreimbursed expenses and compensation for out-of-work communications. We disagree.

1.    *Additional Facts*

The employee handbook contained multiple provisions for scheduling and communication. The "Schedules" policy stated, "It is the employee's responsibility to check his/her answering machine/pager/cell phone should any work schedule changes occur." The "Call-Offs" policy said "schedules may be adjusted to meet the demands of [a] fluctuating [patient] census," and employees "must check their messages or answering machine before coming to work." Another section, "Attendance" said, "Generally, employees that are

30

going to be tardy for work or who will be unable to work . . . are required to call a minimum of two (2) hours prior to the start of the shift." There was also a "Standby and Callback" policy. The "Callback" subsection said, in part, that "all time spent on a work related phone call shall be reported by the employee and will be compensated."

Amiatu testified Prime required employees to call "as soon as they knew they would be absent" and "at least two hours before their scheduled start." They had to call "if they were going to be tardy" too, and could be disciplined for not doing so. When asked if Prime reimbursed employees for cell phone costs to "record a tardy," she said if they "submit a reimbursement on their cell phone usage," it would be processed through accounts payable. She also testified employees "must check their messages or answering machines" before work, but "wouldn't say daily"; rather, it was when a supervisor did "call[-]off" (i.e., adjusted employee numbers). She agreed Prime "will pay the employees for all time spent on a work-related phone call," so long as they submit an authorization form (as payroll is "not aware" otherwise.)

Domingo testified "most of the time" after he woke up, he "would check [his] cell phone" for messages, "because sometimes they would text us[,] whether they would change our schedule or . . . ask us to come early." It would take "one to two minutes," and "sometimes . . . a little longer" because he had other messages. He never asked to be paid for this time, because he was not aware he could be. When asked on direct examination if Prime reimbursed his cell phone costs, he said "no," because he was not aware he could be reimbursed. On cross-examination, he was read his deposition testimony in which he said "they will reimburse you" if "they ask you to purchase items for work," and admitted he was "aware that other kitchen

31

workers were reimbursed for expenses." He also admitted nobody told him he "could not submit [his] cell phone bill for reimbursement."

Domingo further testified Quinonez "always calls us" and "always sends us messages when we are off work." A trial exhibit contained all of the text messages he had, and consisted of five pages of brief exchanges with Quinonez. Domingo started two of them; in one, he told her he was switching with another employee the next day, and in the other, he said he could not work because his car was towed. Most of Quinonez's messages involved scheduling, such as asking if he could cover a shift. As for her remaining messages, in one she told him the boiler had not worked and it was best to run the pans through the dishwasher in the morning. In another, she told him about other employees being unavailable, and that it was okay to close the grill. There was also a message in which she told him to check on a pie, and she said he was likely at work for it.

Granger, like Domingo, testified the first thing he would do on work days was check his cell phone for messages. He also testified Quinonez contacted him to leave a message "twice a week," and if he had a voicemail, it took "two to three minutes" to check. He never asked to be paid for checking messages, and when asked if he requested reimbursement, he said he "didn't know if we can . . . ."

Quinonez testified she would contact kitchen employees when shifts had to be covered, to "make those shifts available" to them. Employees "had every right to ignore the message," with no discipline, and Domingo ignored her messages on occasion. An employee "could specify any kind of contact method that they preferred," including home phone, cell phone, or "their mother . . . ." She normally contacted Domingo by text message, as this was his preferred method, and believed most messages related to scheduling. She

did not recall texting Granger, but said it was likely she would have done so for shift coverage. She did not specifically "recall calling a kitchen employee for a work-related call after hours."

When asked if employees were paid when she texted them, Quinonez explained they "always compensated employees for any hours that they worked," including off the clock, but "offering them the opportunity to come into work was not considered work on their part . . . . She agreed "kitchen employees know how to seek reimbursement for business expenses," noting situations when certain workers had to purchase supplies, and acknowledged it was rare.

The trial court found "[a] lot of [Domingo's] text message testimony seemed scripted to the court. Never asked to be paid for this time. . . . Claims 'we complained' because [Quinonez] 'always sends us messages when we are off work.' In light of the relative dearth of documentary evidence, the court disbelieves this testimony." The court also found he admitted "no one told him" he could not seek reimbursement, he was "[i]mpeached with depo" on this issue, and he was unaware of practices in other departments, including as to reimbursements. The court found Granger "[n]ever asked to be paid for checking messages" or reimbursement. The court noted Amiatu's testimony that Prime paid for work-related phone calls, and employees "[j]ust have to submit the form."

The trial court determined Domingo did not establish reimbursement or wage violations based on the cell phone use. It found he "never sought reimbursement, despite being aware he was entitled to, and thus was never denied reimbursement." The court then found, "No wages are due . . . merely as a result of an inquiry . . . about . . . availability to cover a shift. . . . Replying that one is unable to cover a work shift is not 'work.'" Addressing

33

specific messages, the court found the pie text occurred when he was clocked in, and the dishwasher text "simply provided an update . . . so he could act on [it] the following morning, when he was clocked in and being paid." The court noted he "did not respond" and found that "[t]o the extent he even read it before he was clocked in," the "time spent doing so is so 'minute or irregular that it is unreasonable to expect the time to be recorded,' " citing *Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829, 834–835 (*Troester*). The court also determined the evidence did not reflect either claim was representative.

2. *Reimbursement*

a. *Applicable Law*

Section 2802, subdivision (a) provides: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience" to the employer's directions." (See *Cochran v. Schwan's Home Service, Inc.* (2014) 228 Cal.App.4th 1137, 1143–1144 (*Cochran*).) "The purpose of this statute is ' "to prevent employers from passing their operating expenses on to their employees." ' " (*Id.* at p. 1144.) " '[B]efore an employer's duty to reimburse is triggered, it must either know or have reason to know that the employee has incurred an expense.' " (*Wilson v. The La Jolla Group* (2021) 61 Cal.App.5th 897, 919 (*Wilson*).)

In *Cochran*, the Court of Appeal held that when "employees *must* use their personal cell phones for work-related calls, . . . section 2802 requires the employer to reimburse them." (*Cochran, supra,* 228 Cal.App.4th at p. 1140, italics added; *id.* at pp. 1144–1145 [reversing denial of class certification to consider issue of mandatory personal cell phone use].)

"Section 2804 provides that this indemnification requirement [under section 2802] cannot be waived by contract." (*USS–Posco Industries v. Case*

34

(2016) 244 Cal.App.4th 197, 205; § 2804 [any "agreement . . . made by any employee to waive the benefits of this article . . . is null and void"].)

      b.    *Analysis*

Domingo argues the trial court erroneously ignored *Cochran*, section 2804, and standards for representative claims in concluding he did not prove a reimbursement violation. He establishes no error here.

First, Domingo contends the "undisputed evidence showed standard policies[] requiring [him] and all other employees to use their cell phone to call in to Prime," and *Cochran* therefore applies. (*Cochran, supra*, 228 Cal.App.4th at pp. 1144–1145.) We disagree. The trial court impliedly could find Prime did not require employees to use cell phones, and the record supports that finding. The employee handbook reflected, and Amiatu confirmed, that employees had to alert Prime when they were going to be absent or tardy, and check their messages for schedule changes (at least when there were adjustments to staffing numbers). But Quinonez testified employees could use *any* contact method, even a family member, and that text message exchanges about scheduling were voluntary. The handbook also indicated employees could use an answering machine for messages.

Second, Domingo argues the trial court ignored section 2804 in "finding . . . [he] waived his right to [reimbursement] because he 'never sought reimbursement.' " The court did not find Domingo waived anything. Rather, it found he "never sought reimbursement, despite being aware he was entitled to, and thus was never denied reimbursement." This express finding also reflects the court impliedly found that had Domingo submitted a reimbursement request, it would have been addressed. These findings were consistent with applicable law, which requires reimbursement when the employer "know[s] or have reason to know that the employee has incurred an

35

expense." (*Wilson*, *supra*, 61 Cal.App.5th at p. 919.) Domingo cites no authority that section 2804's bar on contractual waiver obviates the need for the employer to have reason to be aware of claimed expenses. He relatedly asserts "common sense dictates [his] claim for reimbursement was timely brought, via [his] . . . lawsuit" and PAGA notice. He cites no case for this assertion, either, and we do not see how it is reasonable to delay a reimbursement request until one is preparing to sue over it.

Finally, Domingo argues the trial court "ignored controlling precedent in finding that [his] claim for reimbursement was not representative," citing the text of section 2802 and its purpose (i.e., to prevent the passing of operating expenses on to employees). He notes Prime's employee handbook states it applies to all employees, and was the same throughout the relevant time period. Neither general reimbursement principles, nor Prime's handbook, establish error here. Domingo has not established Prime required cell phone use, or any practice of denying reimbursements to the extent requested. Indeed, Domingo conceded kitchen employees received reimbursements for other reasons, and he did not know about practices in other departments.[9]

---

[9] Domingo raises more points on reply, which he forfeits because they are late, and to the extent unsupported by argument and authority. (*Raceway*, *supra*, 2 Cal.5th at p. 178; *Badie*, *supra*, 67 Cal.App.4th 779, 784–785.) For example, he argues "all phone costs . . . must be reimbursed," cellular or not. But he does not establish requiring workers to report in when sick or tardy or to check messages, without more, requires reimbursement. He also contends Prime was aware he chose cell phone as his contact method and received work messages, and the trial court improperly denied representative discovery here. But cell phone use still was not required, he has not shown the messages were compensable work (as discussed *post*), and he does not explain how the discovery would have led to a better result.

### 3. *Compensation*

#### a. *Applicable Law*

Wages must be paid to an employee "for all hours worked." (Wage Order No. 5, subd. 4(A).) "[H]ours worked" is "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so . . . ." (Wage Order No. 5, subd. 2(K).) The "time during which ' "the employee is suffered or permitted to work" ' encompasses the time during which the employer knew or should have known that the employee was working on its behalf." (*Troester*, *supra*, 5 Cal.5th at p. 840.)

In *Troester*, which involved a Starbucks worker, the California Supreme Court held the federal de minimis rule did not apply to California wage and hour claims, and although California also had a de minimis rule, it was "not applicable to the regularly reoccurring activities" at issue there, which took four to ten minutes per shift. (*Troester*, *supra*, 5 Cal.5th at p. 848; *id.* at p. 835 [tasks included a computerized "close store procedure," setting the alarm, locking the door, and walking coworkers to their cars].) The Court explained, in part, that it " 'recently . . . "cautioned against 'confounding federal and state labor law' [citation] and . . . 'that where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced.' " ' " (*Id.* at p. 839, quoting *Mendiola*, *supra*, 60 Cal.4th at p. 843.)

The Court concluded, "We leave open whether there are wage claims involving employee activities that are so irregular or brief in duration that employers may not be reasonably required to compensate employees for the time spent on them." (*Troester*, *supra*, 5 Cal.5th at p. 848; see *id.* at p. 834 [similar observation for time that is "so minute or irregular"].)

37

b. *Analysis*

Domingo argues the trial court erred in relying on *Troester*, and undisputed facts establish Prime failed to compensate required work. We disagree the trial court misapplied *Troester*, and Domingo's arguments regarding the record lack merit.

Domingo contends *Troester* held that "[w]hile 'minute or irregular' work may be non-compensable under the federal 'de minimis' doctrine, this doctrine did not apply under California law," and "[i]nstead, due to the 'employee protective' intent behind the [Labor Code], all ascertainable time spent under the employer's control must be compensated[.]" He mischaracterizes *Troester*. The Court recognized that although the California de minimis doctrine did not apply there, where the employee regularly engaged in several minutes of post-shift tasks, there may be "activities . . . so irregular or brief," or "so minute or irregular," as to be noncompensable. (*Troester*, *supra*, 5 Cal.5th at pp. 834, 848.) The trial court here reasonably considered whether the activities at issue were "so minute or irregular" that no compensation was due. Domingo establishes no legal error.[10]

Domingo's arguments as to the record are no better. The facts are, again, disputed, and because he fails to properly challenge the trial court's findings on substantial evidence grounds, he forfeits the issue. (*Foreman, supra,* 3 Cal.3d at p. 881.) His contentions lack merit, regardless.

First, Domingo argues checking and responding to messages was required, as evidenced by "numerous" and "routine" text message exchanges between Domingo and Quinonez. The issue is whether the communication

---

[10] Domingo does not contend the out-of-work communications placed him under Prime's control, and we do not reach that issue.

38

activities at issue were "hours worked," which can implicate duration and regularity.  (Wage Order No. 5, subd. 2(K); *Troester*, *supra*, 5 Cal.5th at pp. 834, 848.)  Substantial evidence supports the finding that these activities were too irregular and minimal to be compensated.

The trial court did not believe Domingo's testimony that Quinonez "always sends [them] messages," citing the "relative dearth of documentary evidence."  The record reflects this lack of evidence, as Domingo produced just five pages of messages, with brief exchanges mostly about shifts and scheduling.  Quinonez also testified workers were not required to respond (and Domingo himself sometimes ignored messages), supporting the conclusion that these exchanges were irregular at most.

The trial court also could find that any time spent on these irregular, brief exchanges, or checking messages in the morning, was minute.  (Cf. *Troester*, *supra*, 5 Cal.5th at p. 843 [in "declin[ing] to decide whether a de minimis principle may ever apply to wage and hour claims," noting FLSA case with "paperwork involving a minute or less" of employee time, and "hypothetical scenarios," such as "an employee reading an e-mail notification of a shift change"]; *id.* at pp. 855–856, conc. op'n, J. Kruger [noncompensable time might occur when "occasionally employees are notified of schedule changes by e-mail or text message during their off hours and are expected to read and acknowledge the messages"; or when a computer login process usually takes "no more than a minute" or far less, but "rare[ly] and unpredictabl[y]" can take two to three minutes].)  The court could impliedly reject Domingo's testimony that it even took him "one to two minutes" to check messages in the morning, given the small number of messages he produced.  Lastly, to the extent employees had to notify Prime when they

were sick or tardy, Domingo does not argue or show these tasks took any routine, non-minute amount of time.

Second, Domingo argues Prime admitted "time spent on off-work calls should be paid, but only if the employee specifically asked for extra pay," and they were never told the "time was compensable, let alone that they had to seek additional payment for it." This is not an accurate description of the record, and does not help him regardless. The callback policy stated "all time spent on a work related phone call shall be reported by the employee and will be compensated," making clear the employee simply had to notify Prime to be paid. Amiatu's testimony confirmed employees did not have to "ask[] for extra pay"; they just had to submit an authorization form, so payroll knew about the call. None of this helps Domingo, either way, because he does not establish sick or tardy calls were "work[-]related"; that kitchen employees otherwise engaged in work-related calls (Quinonez did not remember making any such calls after hours); or that employees who did have work-related calls were not paid for doing so.

F.     *Rounding and Grace Period Policy*

Domingo contends the trial court erred by considering rounding and grace period issues without affirmative defenses; the grace period policy was separate and unlawful; and the rounding policy was unlawful as well. We reject his affirmative defense and grace period arguments, but conclude he has established reversible error as to the rounding policy based on the record before us.

1.     *Additional Facts*

Prime used a JBDev timekeeping system, as noted, and a JBDev document explained how shift timekeeping worked. The system tracked time to the minute, and total time for the day was rounded to the nearest tenth of

40

an hour, unless it was within 12 minutes of an hour. In that case the "grace period" applied, and the time was rounded to the nearest whole hour (i.e., 7 hours, 48 minutes, and 8 hours, 12 minutes, rounded to 8 hours). The "Attendance" section of employee handbook stated: "The time keeping [*sic*] grace period is for payroll computation purposes only and not to be confused with the disciplinary process for tardiness."

In Domingo's complaint, he alleged Prime "would receive 'to-the-minute' start and end times," but "thereafter alter - and deduct time from - the Time Records," which "caused the employees to lose compensation, including Overtime Compensation." Prime did not plead affirmative defenses based on its rounding and grace period policy. Domingo propounded requests for admission that mentioned the grace period, and discussed rounding and the grace period in his objection to the referee's recommendation; Prime sought summary judgment on rounding; and both parties addressed these issues in their trial briefs (with Domingo arguing Prime could not rely on them, due to not pleading affirmative defenses).

At trial, Amiatu agreed Prime had "work times to the minute" and took the "extra step" of rounding. She disagreed the grace period "applies only to a certain select area of time," stating "[t]he grace period and the rounding applies to the total hours" of work, and denied Prime had a policy barring work during the grace period. Amiatu acknowledged the JBDev document was not given to employees, but said the grace period was referenced in the handbook and "they also cover it" in the "new hire orientation."

Amiatu confirmed there were 36,227 pay periods "in which a Prime employee worked between 8 hours[,] and 8 hours and 12 minutes," but was paid for 8 hours. She explained how she arrived at the 36,227 figure. If an employee worked at least one day in a pay period where the "grace period

41

didn't work in his favor" (e.g., 8 hours, 3 minutes), she "counted that pay period" and "didn't look at any other dates" in the period. She did not know how many pay periods were "instances where the employee was overpaid." When asked if "Prime ever performed an analysis as to whether its employees [were] fully compensated pursuant to its rounding policy," she responded, "Not to my knowledge."

Amiatu also testified about a summary document she prepared, which showed Domingo gained 23 hours and 19 minutes from rounding between March 2018 and January 2019. A similar document for Granger showed he gained 2 hours and 8 minutes between March and June 2018. Domingo and Granger both had days with additional overtime minutes. Amiatu acknowledged her summary documents did not denote regular and overtime minutes (i.e., in showing minutes gained or lost each day).

Prime stopped applying the grace period in May 2021, and now rounded to the nearest hundredth of an hour. Amiatu said employees were "not happy" about losing the grace period, and she had not heard anyone say they were "happy to have it eliminated."

Quinonez testified it was routine for Domingo to clock out early, and her understanding was that he was "taking advantage of the grace period practice."

The trial court rejected Domingo's affirmative defense argument, stating an "affirmative defense is new matter that defendants are required to plead and prove," the court did "not believe" rounding or grace periods were affirmative defenses under this definition, and "[n]o case" holds otherwise. The court then said it was of "no practical legal significance," as "whether an issue must be pled as an affirmative defense only has potential significance as to notice and the burden of proof," and "[n]either is implicated here." It

explained Domingo had "ample notice" Prime "contended [his] claims failed due to rounding," and its "findings would have been the same if [Prime] bore the burden of proof . . . ."

The trial court then set forth its rulings. The court indicated it was following the holding in *See's Candy Shops v. Superior Court* (2012) 210 Cal.App.4th 889, 896 (*See's I*) that employers can use neutral rounding policies, and concluded the "rounding and grace period policies, operating together, were neutral, both facially and as applied." It found the policies "did not burden employees; indeed, the reverse is true," stating the "only evidence before the court" is that the practices "*benefitted* non-exempt employees." In summarizing Quinonez's testimony, the court had noted "Domingo generally timed clocking out so he could leave early—he took advantage of the grace period, worked it in his favor."

The trial court also discussed issues raised by Domingo in his request for the statement of decision. For example, addressing Domingo's request that the court "address whether a grace period is permissible if employees are performing work," the court found it was not a principal issue, and further stated it was not "an intelligible request considering . . . how the grace period" worked. The court explained it was "one step of a two-part, inextricably intertwined rounding process," whereas the *See's* grace period "applied to a particular time of the day."

2.      *Applicable Law*

In *See's I*, the employer calculated pay "based on . . . [timekeeping system] punch times, subject to adjustment under two policies: (1) the nearest-tenth rounding policy and (2) the grace period policy." (*See's I*, *supra*, 210 Cal.App.4th at p. 892.) For the latter, employees could "voluntarily punch in up to 10 minutes before their scheduled start time and 10 minutes

43

after their scheduled end time," but were paid based on scheduled time. (*Id.* at pp. 892–893.) An employee filed a class action, the trial court entered a summary adjudication order rejecting the employer's affirmative defenses regarding rounding, and, in a 2012 decision, we granted writ relief to the employer. (*Id.* at pp. 893, 899, 913–914.)

Recognizing "no California statute or case law specifically authoriz[ed] or prohibit[ed]" rounding, we determined the "federal/DLSE standard," which "allows rounding if the employees are fully compensated 'over a period of time,' " was appropriate. (*See's I, supra*, 210 Cal.App.4th at pp. 901–902, citing 29 C.F.R. § 785.48, subd. (b), DLSE Manual, §§ 47.1, 47.2.) We explained that "[a]ssuming a rounding-over-time policy is neutral, . . . the practice is proper under California law because its net effect is to permit employers to efficiently calculate hours worked without imposing any burden on employees." (*See's I,* at p. 903; *ibid.* [policies underlying federal regulation, which recognize rounding can be practical and neutral, "apply equally" to California's "employee-protective policies"].) We concluded "an employer is entitled to use the nearest-tenth rounding policy if the rounding policy is fair and neutral on its face and 'it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.' " (*Id.* at p. 907.)

In *Silva v. See's Candy Shops* (2016) 7 Cal.App.5th 235 (*See's II*), disapproved on other grounds in *Donohue, supra*, 11 Cal.5th at page 77, we affirmed summary judgment for the employer on the rounding and grace period policies. (*Id.* at 247–248, 252–253.)

44

### 3.  *Analysis*

#### a.  *Affirmative Defenses*

Domingo does not establish the trial court committed prejudicial error by considering Prime's rounding and grace period policy in the absence of affirmative defenses.

First, Domingo does not establish error.  An answer "must contain '[a] statement of any new matter constituting a defense,' in other words, an affirmative defense."  (*Advantec Group, Inc. v. Edwin's Plumbing Co., Inc.* (2007) 153 Cal.App.4th 621, 627; citing Code Civ. Proc., § 431.30, subd. (b)(2)].)  He cites no authority that rounding and grace periods must be pled as affirmative defenses.  Instead, he argues it was undisputed Prime "did not list" these issues in its answer.  But his complaint asserted Prime altered and deducted time, and he does not explain what that alteration could refer to *besides* the rounding and grace period policy, such that the policy would be "new matter."  Domingo also argues that "if the onus of proof is thrown upon the defendant, the matter to be proved by him is new matter," citing *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 239 (*Harris*) and other cases on affirmative defenses.  (E.g., *Cal. Academy of Sciences v. Cnty. of Fresno* (1987) 192 Cal.App.3d 1436, 1442 ["fail[ure] to plead affirmative defenses waives them"].)  These cases do not address rounding and grace periods, much less hold the defendant always has the burden on them.

Second, and regardless, Domingo does not show prejudice.  (See *Harris*, *supra*, 56 Cal.4th at p. 240 ["a defect in a pleading that otherwise properly notifies a party cannot be said to affect substantial rights"; lack of affirmative defense did not mean trial court erred by instructing jury on the issue]; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573 [judgment cannot "be reversed unless error cause actual prejudice"].)  The trial court found

45

Domingo had "ample notice" that Prime was relying on its rounding and grace period policy, and the record reflects as much, including discovery requests and briefing by Domingo. The court also indicated its findings here would have been the same if Prime bore the burden of proof. Domingo does not establish his ability to present or prove his case was impaired by the lack of affirmative defenses.

        b.     *Grace Period*

Domingo argues the rounding and grace period policies were separate, and Prime did not establish the grace period met conditions set forth in *See's II*. The trial court found the grace period was part of the rounding policy, the record supports that finding, and the *See's II* grace period analysis does not apply.

First, the trial court found Prime's grace period was "one step of a two-part, inextricably intertwined rounding process." The record supports this finding. As explained in the JBDev document and confirmed by Amiatu, total time for the day was rounded to the nearest tenth, unless it was within 12 minutes of an hour, when it was rounded to the nearest hour. Even if these were separate policies, they would be separate *rounding* policies—not one rounding policy, and one grace period policy that, as in *See's*, applied to actual, particular periods of time. (Cf. *See's II*, *supra*, 7 Cal.App.5th at p. 237 [grace period policy "permits employees to clock in 10 minutes before and after a shift, but calculates work time from the employee's scheduled start and end times"].)

Second, and in turn, we reject Domingo's argument that Prime's grace period was unlawful under *See's II*. There, this court affirmed summary judgment for the employer as to its grace period policy, where the employer

provided evidence that during the grace period, it barred employees from work and exercised no control over them. (*See's II*, *supra*, 7 Cal.App.5th at p. 253; *ibid*. [employees "could (and did) engage exclusively in personal activities" during this time].) Here, again, the grace period was a part of the rounding policy, not an actual time period in which an employee could work.

c.    *Rounding*

During initial briefing in this appeal, Domingo asserted Prime's rounding policy resulted in recorded work time being deducted. He argued the policy was unlawful because, among other things, it conflicted with *Donohue's* concerns about rounding in light of technological advancements and *Troester's* concerns about full compensation. (See *Donohue*, *supra*, 11 Cal.5th at p. 74; *Troester*, *supra*, 5 Cal.5th at pp. 835, 845.) Prime argued its policy was "neutral on its face and in practice worked to the benefit of employees" (italics omitted), and was lawful under *See's I*. Prime further argued that "even if Domingo's reading of *Donohue* was sound," it would not require reversal, because Wage Order 5 uses the FLSA definition of "hours worked" for the health care industry and the FLSA "explicitly endorses rounding."

After briefing concluded, *Camp v. Home Depot U.S.A., Inc.* (2022) 84 Cal.App.5th 638 (*Camp*) reversed summary judgment for an employer on a rounding claim, and "invite[d] the [California Supreme Court] to 'decide[] the validity of the rounding standard articulated in *See's Candy*,' " as applied to an employer that captures all minutes worked and then applies rounding. (*Camp*, *supra*, 84 Cal.App.5th at pp. 644, 660–661.) The California Supreme Court granted review in *Camp*. (Review granted Feb. 1, 2023, S277518.) *Woodworth v. Loma Linda University Medical Center* (2023) 93 Cal.App.5th

1038 (*Woodworth*) subsequently reversed summary adjudication on a rounding claim, expressing its agreement with *Camp*. (*Id.* at pp. 1045–1046.)

At this court's request, the parties filed supplemental briefs addressing the applicability of Wage Order 5's "hours worked" definition to rounding and this case; the applicability of *Camp* and *Woodworth*; and the sufficiency of the evidence that Prime's rounding policy was neutral as applied.

We conclude there was no substantial evidence for the trial court's finding that Prime's rounding policy was neutral in application. Accordingly, Domingo has established reversible error, regardless of which rounding standard applies (if any), and we need not resolve that issue in this appeal. We explain.

Under both *See's I* and federal law, an employer may use a rounding policy that is facially neutral and " 'is used in such a manner that it will not result, over a period of time, in failure to compensate' " employees for all time worked. (*See's I*, *supra*, 210 Cal.App.4th at p. 907, citing 29 C.F.R. § 785.48; see *Houston v. Saint Luke's Health System, Inc.* (8th Cir. 2023) 76 F.4th 1145, 1152–1153 [vacating summary judgment for employer on rounding claim; explaining federal regulation "does not require rounding; it permits it" and "permission comes with conditions: chiefly, that the rounding 'will not result' in systematic or routine underpayment 'over a period of time' for work performed"].) In *See's*, there was expert evidence for the neutrality of the employer's rounding policy. (*See's II*, *supra*, 7 Cal.App.5th at pp. 249–250 [expert concluded "based on two statistical studies" that "rounding policy was mathematically neutral over time"]; see also, e.g., *AHMC Healthcare, Inc. v. Super. Ct.* (2018) 24 Cal.App.5th 1014, 1018, 1027–1028 [expert analysis reflected rounding policy was neutral over four-year period].)

Here, in concluding Prime's rounding policy was neutral as applied, the trial court found the "only evidence before the court" was that it "benefitted non-exempt employees . . . ." However, Amiatu's undisputed testimony confirmed there were 36,227 pay periods in which employees worked up to 8 hours 12 minutes, and were only paid for 8 hours, thus losing compensation (and overtime at that). Further, because she counted a pay period if minutes were lost on one day, there could have been *more* than 36,227 days in which employees lost compensation. Although she did conclude Domingo and Granger gained minutes overall (and Prime's interrogatory responses reflected other pay periods in which employees would have gained minutes), there still was no evidence the workforce as a whole made up for the lost compensation over time. Not only was there no expert analysis, but Amiatu disclaimed knowing if Prime ever analyzed whether employees were being fully compensated. This record negates the court's finding that the "only evidence" was that the policy "benefitted . . . employees," and undermines its conclusion that the policy was neutral as applied.

Prime's arguments do not persuade us to reach a different conclusion.

First, Prime argues the evidence regarding the 36,227 pay periods does not show underpayment or lack of neutrality.[11] Prime states that one of these pay periods was a Domingo pay period in which he was overpaid, showing it is "impossible to know" how many pay periods involved a net loss. But we know *every one* of these pay periods had at least one day with unpaid

---

[11] Prime notes Domingo did not focus on the 36,227 pay periods in his opening or reply brief. But he did contend Prime deducted work time based on rounding, and both parties addressed underpayment in their supplemental briefs. We are satisfied the issue was adequately raised and briefed.

49

minutes—and, again, there was no evidence of overpayment sufficient to neutralize that loss.

Second, Prime argues that Domingo and Granger's records reflecting overpayment are adequate to support the trial court's finding that the rounding policy was neutral as applied. Prime asserts courts "have held that rounding policies are neutral in application based on an analysis of the plaintiff's records alone," citing *David v. Queen of Valley Medical Center* (2020) 51 Cal.App.5th 653 and *Corbin v. Time Warner Entertainment-Advance/Newhouse Partnership* (9th Cir. 2016) 821 F.3d 1069. These cases are distinguishable. *David* appeared to involve only individual claims. (See *David*, at pp. 657, 664 [affirming summary judgment on plaintiff's rounding claim, based on facially neutral policy and expert analysis of plaintiff's time punches; no discussion of class claims or PAGA].) *Corbin* did not analyze rounding-related evidence as to other employees, meaning it did not consider a record comparable to that before us. (*Corbin*, at pp. 1069, 1075–1079 [affirming summary judgment on rounding claim based on plaintiff records].)

Having concluded there was no substantial evidence that Prime's rounding policy was neutral as applied, we reverse the judgment to the extent it is based on that policy.

G.    *Treatment of Shift Differential In Regular Rate*

Domingo contends the trial court erroneously found Prime correctly calculated the regular rate, with respect to shift differentials. He does not establish any error.

1.    *Additional Facts*

Prime's employee handbook has a section titled "Shift Differentials," which states "[n]on-exempt employees in designated positions will be compensated for hours worked into the evening, night or weekend shifts."

50

Copies of wage statements for Domingo and Granger are in the record. Each covers a two-week pay period, and has four columns pertinent here: "Earning Description" (pay type; e.g. "Regular," "Overtime," etc.); "Rate"; "Hours" (listed using decimal points); and "Amount." On some statements, "Evening Shift" is in the Earnings Description column; the corresponding Rate is $1.00, and the Amount is the product of $1.00 and the identified Hours. For example, Domingo's September 28, 2018 wage statement shows 1.4 Evening Shift hours, and $1.40 in the Amount column. Similarly, Granger's March 30, 2018 wage statement shows 38.6 "Evening Shift" hours, for an additional $38.60.

Amiatu testified that when Prime calculates the regular rate, it "divides the employees' total compensation for the workweek by the total hours worked during the applicable workweek . . . ." It "applies a shift differential" if one was paid. When Domingo's counsel asked if the shift differential was a "fixed amount" and a "flat sum rate of pay," she said "correct" to each question. On subsequent questioning by Prime's counsel, she agreed a "shift differential [is] a higher wage" and "increase[s] . . . with hours worked," and denied it was "any sort of flat sum bonus." Amiatu also addressed shift differentials when she testified about the attestation screen, which showed "any differential." The trial court asked, "[W]eekends differential, they get 1.24 times their regular rate of pay . . . ?" She responded, "Yes, multiplied to their hours."

The trial court stated Amiatu testified, "Shift differential is a higher wage for weekend or night work. Increases with hours worked." The court determined Domingo's regular rate claim based on shift differentials was not at issue, because he did not allege it in his complaint. The court then

51

determined that, if it were at issue, the evidence reflected Prime "calculates the regular rate . . . correctly . . . ."

2.      *Applicable Law*

"Under Labor Code section 510 and the [Industrial Welfare Commission] wage orders, an employee's overtime pay rate is a multiple of his or her 'regular rate of pay.' " (*Alvarado v. Dart* (2018) 4 Cal.5th 542, 561 (*Alvarado*).)  "[A]n employee's 'regular rate of pay' . . . is not the same as the employee's straight time rate (i.e., his or her normal hourly wage rate). Regular rate of pay, which can change from pay period to pay period, includes adjustments to the straight time rate, reflecting, among other things, shift differentials and the per-hour value of any nonhourly compensation the employee has earned." (*Id.* at p. 554.)

In *Alvarado*, the California Supreme Court addressed how the regular rate "should be calculated when the employee has earned a flat sum bonus during a single pay period." (*Alvarado*, *supra*, 4 Cal.5th at p. 549.)  The employer there paid a "flat sum of $15 per day of weekend work" (i.e., a "weekend attendance bonus").  (*Id.* at pp. 549, 570.)  The Court held the flat sum bonus had to be divided by the "number of nonovertime hours the employee worked during the pay period." (*Id.* at p. 549, italics omitted.)  It "limit[ed] [its] decision to flat-sum bonuses comparable to the attendance bonus at issue" there.  (*Id.* at p. 561, fn. 6; see *id.* at pp. 567–568 ["If a bonus is a reward 'for each hour of work,' and its amount therefore increases in rough proportion to the number of hours worked," it "might be said . . . the bonus . . . constitutes base compensation, including base compensation for overtime work, in which case one might be able to argue that only the overtime premium need be added."].)

3.    *Analysis*

Domingo maintains he preserved his shift differential theory, Prime admitted the differential was a flat sum, and Prime thus improperly failed to use nonovertime hours as the divisor, in violation of *Alvarado*.

First, even if Domingo preserved the shift differential theory, substantial evidence supports the trial court's finding that Prime's shift differential was a "higher wage," not a flat sum. Amiatu testified the shift differential was a wage multiplier, and the wage statements in the record reflected as much. She also denied the shift differential was "any sort of flat sum bonus." To establish Prime's purported admission that the shift differential actually was flat sum, Domingo cites Amiatu's affirmative responses to his counsel's questions about whether the shift differential was a "fixed amount" and a "flat sum rate of pay." But, as discussed above, the trial court could credit the consistent testimony and evidence, and decline to focus on these limited, arguably inconsistent responses. (*Daniel G.*, *supra*, 120 Cal.App.4th at p. 830.)

Second, because Prime's shift differential was not a flat sum, Domingo's reliance on *Alvarado* is misplaced. As noted, the California Supreme Court limited its holding to flat sum bonuses. (*Alvarado*, *supra*, 4 Cal.5th at p. 561, fn. 6; see *Bowen v. Target* (9th Cir. 2022) 2022 WL 16570815, at *1–2 [use of "total hours" as divisor for incorporating shift differential was not error; "*Alvarado*'s reasoning does not apply here. In contrast to flat-sum bonuses, shift premiums are not fixed; they are hourly payments and are proportional to hours worked . . . and will increase as an employee works additional overtime"].)

53

E.      *Free Parking and Badge Access Requirements*

Domingo argues the trial court erred by rejecting his argument that time spent complying with free parking and badge access rules was compensable.  We disagree.

1.      *Additional Facts*

Prime's employee handbook contained policies pertaining to parking and security.  The parking policy stated employees "must follow the parking area rules," subject to being towed and/or disciplinary action.  The policy further stated, "[i]n an attempt to build and maintain solid community relations, it is imperative that employees use the parking areas provided as opposed to parking in residential areas," and "employees may not park in areas designated as outpatient, handicapped, receiving and Emergency Department parking."  Another policy required employees to wear identification badges, explaining the purpose was "two-fold: (1) to clearly identify employees to patients, their visitors and security and (2) to identify employees to police, fire, and emergency personnel in the event of an emergency."

Durand Hartin, Prime's Regional Security Manager, said Prime had lots where employees could park.  He testified the handbook statement about not parking on residential streets was not enforced at all, they do not patrol those streets, and he was unaware of citations, discipline, or towing occurring as a result of such parking.  Hartin also testified employees traveled to work by walking, taking the bus, carpooling, using ride-share apps, and being dropped off.

With respect to facility access, Hartin explained an employee who parked on-site would "badge in" at the parking entry gate, by "just tak[ing] out [the] badge and put[ting] it in front of the reader."  The employee would

badge out from the employee parking pedestrian gate. The employee then badged in to the "loading dock, inside the Hospital, wherever their department is . . . ." If an employee entered the front door during business hours, they would still have to wear the badge, but not place it on a reader.

Domingo testified he drove to work, but had walked when he was new. He said he would badge in at a main gate, and then into the employee parking lot. After parking, he would badge out of the lot; walk to the Hospital, which took "about a minute"; and badge in. Granger similarly testified it took "one minute" to walk to the Hospital after parking, and said he would enter "from the back," which was "close to the kitchen . . . ."

Bennett Berger, Domingo's expert, said that based on Prime's "access granted" badge swipe records, Domingo's initial swipe was an average of 4.13 minutes before he clocked in, and his final swipe was an average of 5.13 minutes after he clocked out.

The trial court found Domingo's "effort to demonize [Prime's] provision of free employee parking . . . frivolous," and stated, "The evidence is overwhelming that the persons who most benefitted from the existence of employee parking are the employees." The court also disagreed employees "were 'working' from the moment they first used" their identification badges. It found "[m]erely being required to wear an ID badge is not 'work.' " The court distinguished the exit searches in *Frlekin v. Apple Inc.* (2020) 8 Cal.5th 1038 (*Frlekin*), explaining that "proof of the applicability of the 'control' clause that was central" to *Frlekin* was not present. The court explained "nothing prevent[ed]" a Prime employee from "accessing the security gate, parking, and then walking to a coffee cart or bagel shop" before work, or "walking to the post office or conducting another personal errand" after work

55

(prior to returning to the parking lot). The court concluded its "findings render Mr. Berger's calculations largely irrelevant."

2. *Applicable Law*

As noted above, "[h]ours worked" is "the time during which an employee is subject to the control of an employer." (Wage Order 5, subd. 2(K).) An "employee who is subject to the control of an employer does not have to be working during that time to be compensated . . . ." (*Frlekin, supra,* 8 Cal.5th at p. 1046, italics omitted, citing *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 585 (*Morillion*).)

In *Morillion*, the California Supreme Court held agricultural workers who were required to take an employer-provided bus to and from the fields engaged in compensable "hours worked" while riding on the bus. (*Morillion, supra,* 22 Cal.4th at p. 578.) They were subject to the employer's control, because they were "foreclosed from numerous activities in which they might otherwise engage if they were permitted to travel to the fields by their own transportation." (*Id.* at p. 586; compare *Overton v. Walt Disney Co.* (2006) 136 Cal.App.4th 263, 271 (*Overton*) [distinguishing *Morillion*; time spent taking optional employer-provided bus from assigned lot was not compensable, where employees could use alternative transport].)

In *Frlekin*, the Court held that time spent by Apple employees "waiting for and undergoing exit searches" of bags and packages was compensable. (*Frlekin, supra,* 8 Cal.5th at p. 1051.) Apple exercised control in multiple ways: it required compliance "under threat of discipline"; "confin[ed] its employees to the premises" during the process; and compelled "specific and supervised tasks" by employees. (*Id.* at p. 1051; *ibid.* [tasks included "locating a manager or security guard and waiting for that person to become available, unzipping and opening all bags and packages, moving around

56

items within a bag or package, removing any personal Apple technology devices for inspection, and providing a personal technology card for device verification"].)  Employees estimated the process took "five to 20 minutes," up to 45 minutes on "the busiest days."  (*Id.* at p. 1053.)  The Court also noted that whether an "activity primarily benefits the employer" is a "relevant consideration," and the "exit searches are imposed mainly for Apple's benefit."  (*Id.* at p. 1052.)

    3.    *Analysis*

Substantial evidence supports the trial court's determination that compliance with the parking and badge access rules was not compensable.

First, ample evidence reflects Prime did not exercise control via its parking rules, but, rather, that free parking was intended as a benefit and employees could still pursue personal tasks before and after work.  Parking was optional, as employees could walk, take public transport, or use other methods to get to work.  (See *Overton, supra,* 136 Cal.App.4th at p. 271 [time spent taking optional employer bus was noncompensable]; compare *Frlekin, supra,* 8 Cal.5th at p. 1049 ["[b]y determining when, where, and how its employees must travel . . . the employer in *Morillion* exercised a significant level of control"].)  Domingo himself walked when he first started at Prime. For those who did drive and park on site, Domingo cites no evidence that parking cost anything or that there were set entry or exit times—meaning, as the court found, employees could engage in personal tasks after parking and before departing for the day.  That employees were not supposed to park off-site (an unenforced rule) did not, as Domingo suggests, transform the parking benefit into a basis for compensable time.  (Cf. *Rodriguez v. Taco Bell Corp* (9th Cir. 2018) 896 F.3d 952, 956–957 [employer did not exert control by offering discounted lunch that employees had to eat in the store].)

57

Second, we conclude the record also reflects Prime's badge access rules did not result in compensable time, and disagree with Domingo that *Frlekin* is applicable. Even assuming badge access benefitted Prime, it did not impose any control over employees. As Hartin testified, an employee just had to hold the badge up to a reader—to enter gates and doors they would pass through anyway. In contrast, the employees in *Frlekin* had to engage in a multi-step, time-intensive security check before leaving the store that required locating a manager or guard, and precluded personal activities. (*Frlekin, supra,* 8 Cal.5th at p. 1043.) Further, there were multiple Hospital entry points (e.g., "close to the kitchen," front entrance, etc.), facilitating access to different work stations.

Domingo's remaining arguments here lack merit.

First, he argues Prime had "accurate 'to the minute' time records which reflected all daily badge swipes," and Berger testified about uncompensated time incurred by him and Granger. Berger relied on "access event" records, not time records, and the trial court found his calculations irrelevant because the time was not compensable. We agree.

Second, on reply, he contends *Huerta v. CSI Electrical Contractors, Inc.* (2022) 39 F.4th 1176, pending at the California Supreme Court on certified questions, presents the same factual and legal scenario as here.[12] We again disagree. *Huerta* involved a construction site on private land, with one entrance. (*Id.* at p. 1178.) Employees had to stop at a security gate "several miles down the road," where a guard scanned badges and sometimes looked in vehicles, then drive "ten to fifteen" minutes to parking lots. They stopped

---

[12] Although this new reply argument is improper (*Raceway, supra,* 2 Cal.5th at p. 178), the parties addressed *Huerta* in connection with Domingo's motion to stay pending its outcome (which we denied). We elect to address it.

at the gate on exit too, and lines "were often five to [20] minutes long."  (*Ibid.*)

On appeal from partial summary judgment for the employer, the Ninth

Circuit made a certification request to the Court, including as to "whether

[the employer] exerted sufficient control" for time "related to the exit

process," and if the applicable wage order (16) required pay for "time spent

driving between the entrance/exit of the employer's premises and the location

where the shift begins/ends."  (*Id.* at pp. 1181–1182.)

Even if the California Supreme Court holds these activities are

compensable, they are plainly distinguishable from the optional parking and

minimal badge access rules here.  Again, Prime employees could travel to and

enter the Hospital in multiple ways; those who did park had to walk "about a

minute" to the building; and they just had to swipe a badge at gates and

doors, not undergo a security check.

H.    *Wage Statements and Final Wages*

Finally, Domingo contends the trial court erred in determining he did

not establish wage statement and final wage violations.  To the extent these

claims are derivative of claims based on Prime's rounding policy, we reverse

the judgment in part accordingly.  (See *Zuniga v. Alexandria Care Center,*

*LLC* (2021) 67 Cal.App.5th 871, 889, fn. 10 [PAGA action; "Because we

reverse the court's ruling concerning those primary claims, we necessarily

reverse this derivative ruling, as well."].)  The claims fail to the extent they

are derivative of other violations, which he did not establish.[13]  His other

arguments here also lack merit.

---

[13]    Thus, we need not and do not address the recently decided *Naranjo v.*
*Spectrum Security Services* (2022) 13 Cal.5th 93, 101–102, which held meal
period violations can trigger derivative liability for wage statement and final
wage claims (and about which Domingo improperly filed a new authority

1. *Wage Statement*

Domingo contends Prime's use of decimals in its wage statements did not reflect actual hours worked, and the trial court erred in concluding otherwise.

Amiatu testified "one decimal" means "every six [minutes]"; if a wage statement show 40.2 hours, the ".2 is meant to represent 12 minutes"; and for 13.5 hours, the ".5" is "30 minutes." She agreed it did not explain "[w]hat a particular decimal means in terms of [a] range of minutes" (i.e., with respect to rounding). When Domingo was asked if he knew what "0.900" meant in the hours column, he said, "No." Berger testified that of the wage statements he reviewed, 19 out of 34 had decimals (9 of 23 for Domingo, and 10 of 11 for Granger).

The trial court found the evidence did not establish employees received inaccurate wage statements. It stated Domingo's theory about Prime listing hours as a decimal was not in his PAGA notice or complaint. The court found that "in any event," employees "can 'promptly and easily determine' their wages when 'hours worked' is listed as a decimal." It further found using hours and minutes would "make calculating gross wages much more tedious and difficult to determine for employees and therefore would be contrary to the public policy underpinning [Section 226]."

Even if Domingo preserved his wage statement theory, he does not show the trial court erred in rejecting it.

_____

letter with argument, and included argument on reply). Domingo also forfeits his assertion on reply that Prime failed to "separately list" meal premiums, for which he cites *Naranjo*; he did not raise the point in discussing the *Naranjo* Court of Appeal decision in his opening brief, and did not seek to file a supplemental brief to do so. (*Raceway*, *supra*, 2 Cal.5th at p. 178; *Rincon, supra,* 43 Cal.App.5th at p. 1002.)

Section 226 "requires an employer to supply each employee . . . a written wage statement" listing various items, including "total hours worked." (*Ward v. United Airlines* (2020) 9 Cal.5th 732, 743 (*Ward*).) "The core purpose of section 226 is 'to ensure an employer 'document[s] the basis of the employee compensation payments' to assist the employee in determining whether he or she has been compensated properly.' " (*Id.* at p. 752.) An employee suffers injury under section 226 if the employer fails to provide the required information, and the employee "cannot promptly and easily determine from the wage statement" certain information, including total hours worked. (§ 226, subd. (e)(2)(B)(i).) " '[P]romptly and easily determine' means a reasonable person would be able to readily ascertain the information without reference to other documents or information." (*Id.* at subd. (e)(2)(C).)

Domingo argued in his opening brief that Prime "admitted that it fails to explain what its decimals mean in terms of actual minutes worked," citing Amiatu's testimony. On reply, he belatedly argues he preserved his decimal theory, and suggests using decimals for "hours worked" is impermissible under section 226. Assuming he did not forfeit these points, they lack merit.

First, Amiatu did explain how decimals on the wage statement showed hours and minutes worked for payroll purposes, indicating, for example, that "one decimal" is "six minutes" and ".2" is 12 minutes. What she acknowledged was that the statements did not show the decimal meaning in terms of unrounded minutes (i.e., that ".5" could result from 27 to 32 minutes). But Domingo cites no authority that a wage statement must explain rounding. As for his testimony that he did not know what "0.900" meant, the trial court could impliedly find it not credible.

Second, Domingo does not establish use of decimals for "hours worked" is unlawful. He cites section 226's requirement that wage statement

information be ascertainable without reference to other documents or information.  But the trial court found Prime employees *could* determine their wages with the time listed in decimals, and it could be harder to calculate wages with separate minutes.  Domingo does not show these findings were erroneous.  (See *Raines v. Coastal Pacific Food Distributors, Inc.* (2018) 23 Cal.App.5th 667, 677 [affirming summary adjudication for employer, where wage statement did not list overtime rate, but did list hours and amount; explaining rate could be " 'promptly and easily' determined by simple arithmetic" and "no additional documents or information are necessary"].)

2.     *Final Wages*

Finally, Domingo contends the trial court erred by rejecting his claim that his final wages were paid after termination.

Domingo's employment was terminated on January 17, 2019.  A note in his time records stated, "Timecard Approval . . . Approved on 1/18/2019."  Amiatu testified she was not at the Hospital on the day Domingo was terminated, did not recall if he was provided with a paycheck that day, and agreed that "in order for a paycheck to be provided, a manager should have approved it."

Quinonez testified she was at Domingo's termination meeting, which was in director Kristin Holmskog's office.  Quinonez remembered bringing Domingo's final paycheck to the meeting, and said Holmskog would have given Domingo the final paycheck.  For his part, Domingo testified he was called to the director's office, and was read and handed a termination letter.  His counsel asked if he was given any other document, and he said, "I don't recall . . . .  I was so confused that day . . . , I don't recall, sir."  His counsel then asked, "Do you recall receiving a paycheck on the day of your

termination?" He said, "I don't remember what they handed me that day. I understand after I received a week through mail [*sic*]." On cross-examination, Domingo agreed he did not recall if he received his final check at the termination meeting.

The trial court "did not believe" Domingo's testimony that he "does not recall receiving check [and] understands he received it after a week in the mail." Summarizing Quinonez's testimony, the court stated, "Domingo got his final check at his termination meeting." The court found Domingo did not meet his burden, explaining that "[s]aying he didn't recall receiving it is not the same as saying he wasn't paid" and the evidence did not reflect the claim was representative.

Domingo does not establish the trial court's findings were inconsistent with the law or record. "The prompt payment provisions of the Labor Code impose certain timing requirements on the payment of final wages to employees who are discharged . . . ." (*McLean v. State of California* (2016) 1 Cal.5th 615, 619.) "If an employee is discharged, 'the wages earned and unpaid at the time of discharge are due and payable immediately.' (§ 201, subd. (a).)" (*McLean*, at p. 619.)

Substantial evidence supports the trial court's finding that Domingo received his check at his termination meeting, and, thus, did not prove Prime violated the final wage payment requirements in this regard. Quinonez testified she brought Domingo's final paycheck to the termination meeting, and director Holmskog would have given it to Domingo. Domingo's testimony, while equivocal, made clear he received the check at some point. The court could infer from this evidence that Holmskog did in fact give the final paycheck to Domingo at the termination meeting.

The other evidence at trial did not undermine this inference. Even if Domingo did not recall receiving the check at the termination meeting (which the trial court did not appear to believe), that would not prove lack of receipt. (Cf. *Gilbert v. City of Chicago* (N.D. Ill. 2019) 404 F. Supp. 3d 1215, 1219 ["there is a difference between 'not remembering and affirmatively stating something did not happen.' "].) As for Amiatu's testimony that a manager "should have" approved a check before issuance, she did not state that process occurred here, and did testify she was not at the Hospital the day Domingo was terminated and did not recall if he received his check at the termination meeting.

## DISPOSITION

The judgment is reversed in part, to the extent it is based on Prime's rounding policy and in accordance with this opinion. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.